# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

October 13, 2011

No. 10-20493

Lyle W. Cayce
Clerk

ROBERT E. EVANS; RELMOND H. HAMILTON; DENNIS HARTHUN,

Plaintiffs – Appellants

v.

STERLING CHEMICALS, INCORPORATED, Individually and as successor-in-interest to Sterling Chemicals Holdings Incorporated; STERLING CHEMICALS INCORPORATED EMPLOYEE BENEFITS PLANS COMMITTEE, in its capacity as Plan Administrator of the Sterling Chemicals Incorporated Medical Benefits Plan for Salaried Employees and the Sterling Chemicals Incorporated Prescription Drug Benefits Plan for Salaried Employees; STERLING CHEMICALS INCORPORATED MEDICAL BENEFITS PLAN FOR SALARIED EMPLOYEES; STERLING CHEMICALS INCORPORATED PRESCRIPTION DRUG BENEFITS PLAN FOR SALARIED EMPLOYEES; STERLING CHEMICALS INCORPORATED MEDICAL BENEFITS PLAN FOR RETIREES; STERLING CHEMICALS INCORPORATED PRESCRIPTION DRUG BENEFITS PLAN FOR RETIREES,

Defendants – Appellees

Appeals from the United States District Court
for the Southern District of Texas

Before JOLLY, DeMOSS, and PRADO, Circuit Judges.

HAROLD R. DeMOSS, JR., Circuit Judge:

This appeal requires that we determine what effect, if any, a retiree benefits-related provision included in an asset purchase agreement had on the acquiring company's retiree benefits plans governed by ERISA. For the following

No. 10-20493

reasons we find that the provision constituted a valid plan amendment. Moreover, we find that the provision was assumed, not rejected, in bankruptcy. Reversed and remanded.

## I. FACTUAL BACKGROUND

### A.    The Corporate Acquisition

In 1994, American Cyanamid Corporation (Cyanamid) spun off its fibers business unit into three separate companies: Cytec Acrylic Fibers, Inc., Cytec Technology Corp., and Cytec Industries, Inc. (collectively, "Cytec"). In 1996, Cytec sold the assets of its acrylic fibers business to Sterling Fibers, Inc. (Sterling Fibers), a newly-formed company created to accomplish the acquisition and a wholly-owned subsidiary of Sterling Chemicals, Inc. (Sterling Chemicals). Sterling Chemicals is itself a wholly-owned subsidiary of Sterling Chemicals Holdings, Inc. (collectively with Sterling Fibers and Sterling Chemicals, "Sterling"). The acquisition was consummated pursuant to an Asset Purchase Agreement dated December 23, 1996 (the APA). The APA was authorized by the boards of directors of the six respective companies and was signed by the chairman of the three Sterling companies and representatives of the three Cytec companies.

In connection with the acquisition, Sterling offered employment to certain Cytec employees. The APA designated those Cytec employees who accepted employment with Sterling as "Acquired Employees." The APA also included a provision devoted to continued medical benefits for Acquired Employees when they retired. Pursuant to Section 5.05(f), Sterling guaranteed its Acquired Employee retirees a certain level of benefits and a certain level of premiums, which benefits could only be reduced and which premiums could only be increased if Cytec provided prior written consent. For its part, Cytec guaranteed that it would notify Sterling and provide Sterling with prior written consent if Cytec reduced its own retiree benefits or raised its own retiree premiums.

No. 10-20493

Section 5.05(f) of the APA provided in relevant part:

> [Sterling] shall continue to provide postretirement medical and life insurance benefits for such [qualifying] Acquired Employee that are no less favorable to such Acquired Employee than those benefits provided by [Cytec] under the [Cytec benefit plans] as in effect on the date hereof, and [Sterling] shall not reduce the level of such benefits without the prior written consent of [Cytec]; <u>provided</u>, that such consent shall not be withheld to the extent that [Cytec] or Cyanamid has similarly reduced the level of such benefits. For purposes of this Agreement, an increase in premiums required to be paid for postretirement benefits shall be considered a reduction in such benefits. [Cytec] shall notify [Sterling] in writing to the extent that [Cytec] becomes aware of a reduction in postretirement medical and life insurance benefits under the [Cytec benefit] plans.

(emphasis in original).

Following the acquisition, Plaintiffs (a group of approximately one hundred Acquired Employees) became employees of Sterling Fibers and participants in Sterling's various employee benefits plans, each of which were sponsored and operated by Sterling Chemicals. When Plaintiffs retired, they became participants in Sterling's retiree medical and prescription drug benefits plans (collectively, the Sterling Plan). As retirees and participants in the Sterling Plan, they continued to pay the same level of premiums and receive the same level of benefits as were agreed upon in Section 5.05(f). From December 1996 until April 2003, Plaintiffs' premiums were lower than those premiums paid by participants in the Sterling Plan who were not Acquired Employee retirees.

Sterling immediately included Plaintiffs in the Sterling Plan, collecting premiums and providing benefits, but it did not write any new provisions into the formal documents that made up the Sterling Plan. Each of the formal plan documents contained reservation-of-rights provisions permitting amendment or modification of the Sterling Plan "at any time and from time to time" by action of Sterling's Employee Benefits Plans Committee (the Committee). Additionally,

3

multiple summary plan descriptions (SPDs), which "provide communication with beneficiaries *about* the plan, but . . . do not themselves constitute the *terms* of the plan," *CIGNA Corp. v. Amara*, 131 S. Ct. 1866, 1878 (2011), also provided that the Sterling Plan "may be amended at any time by [the Committee] or the Board of Directors." The first SPD issued after the acquisition, dated February 1997, included a provision expressly permitting Acquired Employee retirees to participate in the Sterling Plan. It also noted that premium rates could be obtained from Sterling's human resources department. At least one SPD also included language indicating that certain plan participants had special rights related to premiums. However, none of the formal Sterling Plan documents or the various SPDs describing the Sterling Plan ever expressly referenced Section 5.05(f) of the APA.

## B.    The Sterling Bankruptcy Proceedings

On July 16, 2001, more than four years after the acquisition, Sterling filed for Chapter 11 bankruptcy. Throughout the bankruptcy proceedings, Plaintiffs' benefits and premiums under the Sterling Plan remained unchanged.

On October 18, 2002, Sterling filed a motion seeking the bankruptcy court's authorization to reject certain executory contracts, including the APA, and on November 13, 2002, the bankruptcy court granted the motion. On November 20, 2002, the bankruptcy court entered an order (the Confirmation Order) confirming Sterling's Plan of Reorganization effective as of December 19, 2002. The Confirmation Order provided: "Any retiree benefits within the meaning of 11 U.S.C. § 1114 will be treated as executory contracts and assumed pursuant to Section 7.5 of the Plan [of Reorganization]. Thus, the requirements of 11 U.S.C. § 1129(a)(13) are satisfied." Relatedly, Section 7.5 of the Plan of Reorganization provided in relevant part:

> Except to the extent (a) previously assumed or rejected by an order of the Bankruptcy Court on or before the Confirmation Date, or (b)

the subject of a pending motion to reject filed by [Sterling] on or before the Effective Date, all other employee compensation and benefit programs of [Sterling's], including all pension plans and including all programs subject to Sections 1114 and 1129(a)(13) of the Bankruptcy Code, entered into before or after the Petition Date and not since terminated, shall be deemed to be, and shall be treated as though they are executory contracts that are assumed under the Plan. All pension plans shall continue in effect on and after the Effective Date. Nothing contained herein shall be deemed to modify the existing terms of such employee compensation and benefit programs, including, without limitation, [Sterling's] rights of termination thereunder.

Having "assumed" the Sterling Plan as a benefit program, and having "rejected" the APA as an executory contract, Sterling emerged from bankruptcy on December 19, 2002.

## C.    Bankruptcy-Related Communications with Plaintiffs

On the bankruptcy filing date, July 16, 2001, Sterling sent two letters and a handout communicating with Plaintiffs about the bankruptcy proceedings. The first letter stated: "As a routine matter, [Sterling's] various benefit programs are being presented to the Court today for approval. We don't expect to see any changes in these programs, including the pension and retiree medical plans." The second letter stated: "As a routine matter, [Sterling's] various employee benefit programs are being presented to the Court for approval. We don't expect to see any changes in these programs, and all plan assets are safe, secure and protected by law." The handout asked and answered: "What is happening to the active and retiree medical plans? These plans are expected to continue as is."

During the bankruptcy, Plaintiffs also received bankruptcy proof of claim forms. Plaintiff Robert Evans was invited to serve on the creditors' committee but he declined to do so. Evans was, however, included on the bankruptcy pleadings service list and admits to monitoring the bankruptcy case. At least

some Plaintiffs were also aware that Sterling filed a motion to reject the APA as an executory contract.

On December 9, 2002, ten days prior to Sterling's emergence from bankruptcy and after the bankruptcy court's confirmation of the Plan of Reorganization, Plaintiffs were sent a letter indicating that their benefits and premiums were guaranteed only through March 31, 2003.

## D.      Post-Bankruptcy Premiums

On April 1, 2003, several months after it emerged from bankruptcy, Sterling raised Plaintiffs' premiums to levels consistent with the premiums paid by the participants in the Sterling Plan who were not Acquired Employee retirees. Thereafter, Plaintiffs' premiums were raised twice more, effective January 1, 2004, and January 1, 2005.[1] There is no indication that either Cyanamid or Cytec made similar increases to their retiree benefit plan premiums, and Sterling did not receive prior written consent from Cytec to increase Plaintiffs' premiums.

## II. PROCEDURAL HISTORY

On February 16, 2007, Plaintiffs filed this case in the Southern District of Texas. On August 23, 2007, the district court denied Sterling's motion to dismiss, stating that the APA amended the Sterling Plan, but it did not decide what effect the APA's rejection in bankruptcy had on the Sterling Plan or on Plaintiffs' rights thereunder. The district court then stayed the case for much of 2008 in order to permit Plaintiffs to exhaust their administrative remedies.

The Committee (acting as administrator of the Sterling Plan) denied Plaintiffs' claims on April 30, 2008, finding that: (i) the APA did not amend the

---

[1] The increases were substantial. For example, the record shows that the three lead Plaintiffs' original monthly premiums under the Sterling Plan were $67.50, $14.73, and $83.45, respectively. Their monthly premiums were increased in 2003 to $1,600, $392.12, and $392.12, respectively. The third Lead Plaintiff Dennis Harthun's monthly premiums were further increased to $575.83 in 2004 and $903.91 in 2005.

No. 10-20493

Sterling Plan; (ii) Sterling's contractual obligation to Cytec was terminated when the APA was rejected in bankruptcy; and (iii) the increase in premiums beginning in 2003 was permitted by the Sterling Plan. The Committee denied Plaintiffs' appeal and issued a final determination on August 12, 2008.

Thereafter, the district court held a bifurcated trial in November 2009, and post-trial briefing was completed in March 2010. The parties' arguments focused largely upon whether *Halliburton Co. Benefits Committee v. Graves*, 463 F.3d 360 (5th Cir. 2006), a case where this court found that a provision in a merger agreement constituted a valid amendment to an ERISA plan, was controlling.

On July 1, 2010, the district court issued a 46-page Memorandum Opinion and Order granting judgment for Sterling on all claims and holding, *inter alia*, that: (i) Section 5.05(f) of the APA did not amend the Sterling Plan and the *Halliburton* case was "wholly distinguishable;" (ii) in the alternative, the "contractual limitation imposed by [Section 5.05(f)] was removed once the Sterling entities rejected the APA during their bankruptcy proceeding and decided to increase premiums thereafter;" and (iii) Plaintiffs' claim that Sterling did not meet the constitutional due process requirements regarding adequate notice was meritless. In making each of its holdings, the district court relied upon "record evidence" which included witness and expert testimony extrinsic to the terms of the APA and the Sterling Plan documents. Plaintiffs timely appealed each of the holdings.

### III. DISCUSSION

Plaintiffs first claim that Section 5.05(f) of the APA constituted an amendment to the Sterling Plan and, as a valid plan amendment, it was "assumed" and not "rejected" in bankruptcy. In the alternative, Plaintiffs claim that they were denied due process when Sterling made "false assurances" that their rights would not be adversely affected by the bankruptcy proceedings. For the following reasons, we find that Section 5.05(f) constituted a valid plan

7

amendment and was assumed in bankruptcy. Therefore we express no opinion as to whether constitutional due process was satisfied when Sterling sent communications to Plaintiffs stating that it did not "expect" the Sterling Plan to be affected during the bankruptcy proceedings. *See In re Kendavis Holding Co.*, 249 F.3d 383, 388 (5th Cir. 2001) (holding that "perfunctory knowledge of the bankruptcy proceeding did not constitute adequate notice to satisfy constitutional due process requirements" where the debtor assured the plaintiff-retiree his rights would not be affected by the bankruptcy).

## A.    Section 5.05(f) Constituted A Valid Plan Amendment

### 1.    Standard of Review is De Novo

This court generally performs a two-step review of a plan administrator's denial of an ERISA claim, *see Wildbur v. Arco Chem. Co.*, 974 F.2d 631, 637 (5th Cir.), *modified*, 979 F.2d 1013 (5th Cir. 1992), but whether a provision in a corporate document such as the APA constitutes a valid plan amendment is a question of law which this court reviews de novo. *See Halliburton*, 463 F.3d at 370.

Sterling concedes that the question of whether *Halliburton* controls this case is subject to de novo review, but it states that this court must still perform the second step of the analysis and review the administrator's rejection of Plaintiffs' claims for abuse of discretion. Sterling is incorrect. If this court determines that, as a matter of law, Section 5.05(f) of the APA amended the Sterling Plan, that is the end of our inquiry. *See id.* at 370–71. No party argues that Section 5.05(f) is ambiguous. Therefore, if Section 5.05(f) is part of the Sterling Plan, it controls the determination of Plaintiffs' rights, and if it is not part of the Sterling Plan, there is no other provision that otherwise restricts Sterling from raising Plaintiffs' premiums. *See Nickel v. Estate of Estes*, 122 F.3d 294, 298 (5th Cir. 1997) ("We review *de novo* questions of law, such as whether an ERISA plan's terms are clear and, if they are, how those terms should be

interpreted."); *Sunbeam-Oster Co., Inc. Group Benefits Plan for Salaried and Non-Bargaining Hourly Emps. v. Whitehurst*, 102 F.3d 1368, 1373 (5th Cir. 1996) (stating that "the preliminary determination whether an ERISA plan's language is silent or ambiguous" is reviewed de novo).

### 2.  *Halliburton* is Analogous and Controls

### a.  Factual Background in *Halliburton*

Whether Section 5.05(f) of the APA constituted a valid amendment to the Sterling Plan turns on whether this court's analysis in *Halliburton* is controlling. In *Halliburton*, a merger agreement between Halliburton and Dresser Industries included a provision whereby Halliburton agreed to maintain Dresser's retiree plans, except to the extent that any modifications were consistent with changes in Halliburton's medical plans for its own similarly situated active employees. 463 F.3d at 362. The merger agreement provided in relevant part:

> [Halliburton] shall and shall cause the Surviving Corporation and each Subsidiary of the Surviving Corporation to take all corporate action necessary to: (i) maintain with respect to eligible participants (as of [September 29, 1998]) the [Dresser] retiree medical plan, except to the extent that any modifications thereto are consistent with changes in the medical plans provided by [Halliburton] and its subsidiaries for similarly situated active employees . . . .

*Id.* at 365 (alterations in original).

The merger agreement also provided that its provisions were solely for the benefit of Halliburton and Dresser and that it did not confer any right, benefit, or remedy to any other person except for members of Halliburton's board of directors, who were permitted to enforce the provisions for three years. *Id.* The stated reason Halliburton and Dresser included the retiree benefits provision in the merger agreement was to permit Dresser retirees to keep their benefits while also giving Halliburton the flexibility to change the Dresser retiree plans as long as it made similar changes for active Halliburton employees. *Id.* at 366. The merger agreement was executed on February 25, 1998, and became effective on

No. 10-20493

September 29, 1998. *Id.* at 364. The respective boards of directors of Halliburton and Dresser approved the merger. *Id.*

On July 16, 1999, Halliburton entered into a separate agreement to assume the sponsorship of, adopt, and continue the Dresser retiree plans. *Id.* at 366–67. The agreement expressly vested Halliburton's benefits committee with the power to administer the Dresser retiree plans, and vested the Halliburton chief executive officer with the power to amend or terminate the Dresser retiree plans. *Id.* at 367. Halliburton could have adopted and sponsored the Dresser retiree plans pursuant to the merger agreement, but instead elected to do so pursuant to the subsequent agreement. *Id.* at 367 n.5. At the end of 2002, Halliburton combined all of the Halliburton and Dresser plans, including the Dresser retiree plans, and shortly thereafter made the Dresser retiree plans sub-parts of the combined plan. *Id.* at 367. At all times following the merger in 1998, the Dresser retiree plans and the Halliburton active employee plans remained unchanged. *Id.*

In November 2003, over five years after the merger, Halliburton modified the Dresser retiree plans so that the Dresser retirees' benefits would be more closely aligned with the Halliburton retirees' benefits. *Id.* It did so by freezing Halliburton's contribution costs, thereby making Dresser retirees responsible for any future increase in premiums. *Id.* Halliburton did not make similar modifications to the combined plan for its own similarly situated active employees. *Id.* at 362, 367. One of the Dresser retirees complained, and the Halliburton benefits committee denied the retiree's request to withdraw the November 2003 amendments. *Id.* at 367–68. The committee concluded that the amendments were consistent with Halliburton's obligations under the merger agreement and that nothing in the merger agreement limited its right to modify the Dresser retirees' benefits. *Id.*

10

No. 10-20493

Thereafter, Halliburton initiated a declaratory action in district court, and the Dresser retirees filed counter-claims and third-party claims. *Id.* at 368. The district court found that the retiree benefits-related provision in the merger agreement constituted a valid plan amendment, and held that "Halliburton must maintain the [Dresser retiree plans] for eligible participants and may adjust benefits in that program only if it makes identical changes to benefits for similarly situated active employees." *Id.* at 369.

### b.    The *Halliburton* Court's Analysis

On appeal Halliburton argued that: (i) the retiree benefits provision in the merger agreement did not "effect a plan amendment" because it did not properly follow plan amendment procedures; (ii) the retirees could not enforce the provision because only Halliburton directors were permitted to enforce the terms of the merger agreement; and (iii) requiring Halliburton to maintain the Dresser retiree plans amounted to an impermissible vesting of benefits. *Id.* at 369–70. The court reviewed de novo the question of whether the retiree benefits provision of the merger agreement constituted a plan amendment. *Id.* at 370.

The *Halliburton* court began by noting that the Dresser retiree plans reserved the right for "the Company" to amend or terminate the plan at any time. *Id.* at 371. Then, after determining that Halliburton succeeded to the rights and obligations under the Dresser retiree plans when it executed the July 1999 agreement, it returned to the question of whether the merger agreement "effectively amended the Dresser [retiree plans] so that Halliburton may amend or terminate the program only to the extent it makes the same changes to the plans for its similarly situated active employees." *Id.* Its analysis proceeded as follows:

> In order to amend a welfare benefit plan governed by ERISA, the employer must provide a procedure for amending such plan, and for identifying the persons who have authority to amend the plan. ERISA imposes no additional formalities on plan amendments. In

> particular, there is no requirement that a document claimed to be an amendment to a welfare plan be labeled as such. Clearly then, a provision in a merger agreement *could* amend a welfare plan, even if it is not labeled as a plan amendment. However, only an amendment executed in accordance with the plan's procedures is effective.

*Id.* at 371–72 (internal quotations and citations omitted).

The court determined that the Dresser retiree plans' procedure for amendment provided that "*[t]he Company* may amend, modify, change, revise, discontinue or terminate the Plan . . . at any time by written instrument signed by the Vice President, Human Resources." *Id.* at 372. It looked to corporate law principles to determine that "officers generally have authority to take action on behalf of the company when that action is approved by the board of directors," and it concluded that the merger agreement effectively amended the Dresser retiree plans. *Id.* at 372–73.

With respect to the question of "who" was permitted to amend the Dresser retiree plans, Halliburton argued that the merger agreement could not effect a plan amendment because Dresser's Vice President of Human Resources did not sign the merger agreement. *Id.* at 373. The court, again citing corporate law principles, stated that while the amendment procedure making reference to the Vice President of Human Resources "constitute[d] a delegation of authority for one way in which the Company may amend the plan[, it did] not, however, constitute the only way in which '[t]he company' may amend the plan." *Id.* It noted that, "[u]nder corporate law principles, Dresser could revoke its delegation of authority and act to amend the plan in some other manner." *Id.* It held that, because Dresser's board of directors approved the merger and its chairman signed the agreement, such actions "were more than sufficient to constitute an action by the company to amend the plan." *Id.* at 374. It then held that the

No. 10-20493

benefits provision in the merger agreement constituted a valid amendment to the Dresser retiree plans. *Id.*

In the alternative, the court noted that because "Halliburton administered its obligations under the [Dresser retiree plans] consistent with" the merger agreement's benefits provision, "to the extent it [was] necessary, Halliburton's *ex post* actions ratified [such provision] as a valid plan amendment." *Id.* at 375.

Finally, the court addressed Halliburton's two other arguments: that the Dresser retirees could not enforce the provision, and that the provision was an impermissible grant of permanent benefits. *Id.* at 376–78. The court succinctly rejected both arguments. First, it pointed out that "enforcement of a plan's provision, including any amendments thereto, falls exclusively in ERISA's remedial scheme," noting that while the retirees could not sue for breach of contract, they could seek clarification of their rights under the terms of the Dresser retiree plans. *Id.* at 375–76. And second, it explained that instead of vesting an "unalterable and irrevocable" benefit on the Dresser retirees, the merger agreement provision simply required that, if Halliburton wanted to amend or terminate the Dresser retiree plans, it could do so as long as it did the same for its own similarly situated active employees. *Id.* at 377. The *Halliburton* court noted that, "[e]mployers generally are free under ERISA to modify or terminate plans, but if the plan sponsor cedes its right to do so, it will be bound by that contract." *Id.* at 378. It ultimately held that:

> Halliburton [could not] unilaterally take away the 'bargained-for rights' that Dresser and Halliburton negotiated and made on the retiree program as part of their merger agreement. The parties were free to impose contractual obligations on the right to amend or terminate the Dresser [plans], and they did. Because of these limitations, Halliburton cannot alter the retiree program, except as consistent with the plan as amended by [the merger agreement provision].

*Id.* (internal citations omitted).

13

No. 10-20493

### c.    *Halliburton* Controls Sterling's Case

This appeal turns on whether, under *Halliburton*, Section 5.05(f) of the APA constituted a valid amendment to the Sterling Plan. *Halliburton* established that a corporate agreement can amend an ERISA plan, whether or not the agreement was expressly intended to effect an amendment. *Id.* at 372 (citing JOHN F. BUCKLEY, ERISA LAW ANSWER BOOK 7 (5th ed. 2006) ("[A]ny act that is directed to a provision of an ERISA plan may be deemed to constitute a plan amendment even though it does not recite that it is intended to amend the plan and it is not included in a plan document."); *see also Horn v. Berdon, Inc. Defined Benefit Pension Plan*, 938 F.2d 125, 127 (9th Cir. 1991) (finding all that is needed to effect an amendment is a properly authorized written instrument directed at plan provisions). Therefore, as long as an agreement is in writing, it contains a provision directed to an ERISA plan, and the plan amendment formalities are satisfied, such agreement or other document will constitute a valid plan amendment. *Halliburton*, 463 F.3d at 370–74.

The APA is a written corporate agreement, and Section 5.05(f) is directed to provisions of both Cytec's and Sterling's ERISA plans (i.e., directing the maintenance of benefits and premiums). Thus, the first two requirements are satisfied.

With respect to the two other amendment formalities—having a procedure for amendment and having a procedure for identifying the persons with authority to amend—the formal documents constituting the terms of the Sterling Plan permit amendments or modifications "at any time and from time to time" by the Committee. Various SPDs that describe the terms of the Sterling Plan but which are not themselves part of the Sterling Plan, *see CIGNA*, 131 S. Ct. at 1878, also state that the Sterling Plan "may be amended at any time by [the Committee] or the Board of Directors." Both formalities were satisfied in this case.

14

The APA required and was granted approval by each of the three Sterling companies' boards of directors, and it was signed by the chairman of each of the three Sterling companies. This approval satisfies the first formality, as *Halliburton* made it clear that, at least pursuant to Delaware law which applied there and which also applies here, a corporation's board of directors retains ultimate control over delegating authority and authorizing corporate actions. *See Halliburton*, 464 F.3d at 372–73. Thus, even if the Committee was the only entity expressly authorized to modify or amend the Sterling Plan under the formal plan documents, the board of directors was empowered to revoke such delegation and authorize the chairman to amend the Sterling Plan by signing the APA. *See Curtiss-Wright Corp. v. Schoonejongen*, 514 U.S. 73, 80 (1995); *Halliburton*, 463 F.3d at 372–74. The SPDs describing the plan amendment process acknowledge as much.

The approval of the APA by Sterling's boards of directors and the execution of the APA by Sterling's chairman on December 23, 1996, satisfied both plan amendment formalities. Under *Halliburton*, at that moment, Section 5.05(f) of the APA became a valid amendment to the Sterling Plan.

### 3.    Sterling's Arguments Are Unpersuasive

Sterling's various arguments do not alter our analysis and conclusion. First, Sterling's argument regarding (and the district court's reliance on) testimony stating that Section 5.05(f) was never intended to amend the Sterling Plan or directly benefit the Acquired Employee retirees is unpersuasive. Sterling asserts that Section 5.05(f) was included in the APA primarily to benefit Cytec with respect to a separate contractual obligation Cytec had with Cyanamid, and that any benefit to Plaintiffs was incidental. However, when addressing the intent-to-amend issue, the *Halliburton* court only referenced the purpose and intent for including the retiree benefits provision in the merger agreement in the factual background section of its opinion. *See Halliburton*, 463 F.3d at 366. It did

No. 10-20493

not include any reference or analysis of the parties' intent in its determination that the merger agreement provision constituted a valid plan amendment. *See id.* at 370–74. That the APA generally, and Section 5.05(f) in particular, did not expressly state an intention to effect a plan amendment is immaterial because such an additional formality is not required by law or by the Sterling Plan's terms. *See id.* at 372.

In this context at least, whether the parties to a corporate agreement which contains a provision directed to an ERISA plan "intend" to amend the plan is irrelevant. Additionally, in its response to the petition for rehearing, the *Halliburton* court stated:

> This is not a case, for example, in which an acquiring company limited a benefit continuation covenant to a specified time period or included an express statement that the merger agreement was not intended to modify or amend any particular plan. We express no view on whether such language would successfully limit the application of ERISA or a plan participant's right to sue.

*Halliburton Co. Benefits Comm. v. Graves (Halliburton II)*, 479 F.3d 360, 361 (5th Cir. 2007). Because the same is true in this case, we likewise express no view as to whether an additional provision in the APA stating that no plan amendment was intended could have effectively prevented Section 5.05(f) from being a valid plan amendment by operation of law.

Second, Sterling argues that Section 5.05(f) "was a contractual obligation owed by Sterling Fibers to Cytec and not an amendment." This argument is also unpersuasive and misses the point of this court's analysis to determine whether or not this contractual provision could constitute a valid plan amendment. Of course Section 5.05(f) was a contractual obligation upon which Sterling or Cytec could sue each other for breach. But that fact does not mean that it was *only* a contractual obligation and not also a plan amendment. The benefits provision in the *Halliburton* merger agreement was also a contractual obligation between the

parties to the agreement. 463 F.3d at 378. But by being directed at the provisions of an ERISA plan and by satisfying the amendment formalities, such merger agreement provision became a valid plan amendment as well. Sterling cites no statute or case law that supports the idea that contractual obligations and plan amendments are mutually exclusive concepts.[2] Pursuant to the foregoing analysis, Section 5.05(f) is a valid plan amendment whose terms can be enforced by Plantiffs under ERISA; whether it is (or was) also a contractual obligation between corporate parties is besides the point for these purposes.

Third, Sterling argues that because it never included the Section 5.05(f) language in its formal plan documents or distributed it to plan participants, Section 5.05(f) could not be part of the plan. Sterling is incorrect. While case law does provide that ERISA plans include the documents distributed to the employees and participants, *see, e.g.*, *Curtiss-Wright*, 514 U.S. at 83, it does not automatically follow that what otherwise would constitute a plan document is not part of the plan if it has not been distributed to plan participants or if its terms have not otherwise been included in the formal plan documents. This is precisely the same situation faced by the *Halliburton* court, and that court was unconcerned with the fact that Halliburton had never included the merger agreement itself or the terms of the retiree benefits-related provision in its formal plan documents or distributed the agreement to the plan participants. Simply because Sterling failed to include the Section 5.05(f) language in its other plan documents and failed to distribute the APA to its plan participants does not mean Section 5.05(f) was not a valid plan amendment. Failure to include or

---

[2] Sterling cites an ERISA case dealing with a collective bargaining agreement (CBA) that included a retiree benefits-related provision in support of its contention that its obligation under Section 5.05(f) was only contractual. *See Int'l Ass'n of Machinists & Aerospace Workers, Woodworkers Div., AFL-CIO v. Masonite Corp.*, 122 F.3d 228 (5th Cir. 1997). But the *Masonite* court did not address the issue of whether the CBA could itself have constituted an ERISA plan amendment, and it is unclear whether the plan amendment formalities were satisfied by the execution of the CBA at issue in that case.

distribute all plan documents—including valid amendments—may be a separate violation of Plaintiffs' rights under ERISA, but it does not change Section 5.05(f)'s status as a valid plan amendment.

Fourth, Sterling's argument that Sterling Fibers, not Sterling Chemicals, had the obligation to maintain the Acquired Employee retirees' benefits under Section 5.05(f) changes nothing. In 1996, the boards of directors of each of the three Sterling companies approved the APA, and the chairman of each of the three Sterling companies signed the APA.[3] At all relevant times, Sterling Chemicals maintained each of Sterling's ERISA plans and provided benefits for all of the Sterling companies' employees and retirees, including those of its wholly-owned subsidiary Sterling Fibers. Immediately after the acquisition, Sterling Fibers placed Plaintiffs into the Sterling Plan maintained by Sterling Chemicals (as was its obligation under Section 5.05(f)) because Sterling Fibers had no plan of its own. Moreover, during the bankruptcy, Sterling Fibers was sold and withdrawn as a participating employer in the Sterling Plan, while Sterling Chemicals retained its obligations under the Sterling Plan to all of Sterling Fibers' retirees (including Plaintiffs). Even if Sterling Fibers was originally the sole contractual obligor under Section 5.05(f), a proposition that does not appear to be correct, Sterling Chemicals became the obligor during the bankruptcy and remained the obligor prior to the first premium increase in 2003. The inter-company organization of the various Sterling ERISA plans does not change Section 5.05(f)'s status as a valid plan amendment.

Finally, Sterling's citation to the *Halliburton* court's response to the petition for rehearing stating that the court's "decision results from and is limited to the specific language used in the corporate documents involved in the Halliburton-Dresser merger," does not change our analysis or conclusion. *See*

---

[3] In this case, the chairman of each of the three Sterling companies was the same person.

*Halliburton II*, 479 F.3d at 361. Insofar as its rules and analysis are sound and its facts are analogous, *Halliburton* is controlling precedent that we must follow. *See Rios v. City of Del Rio, Tex.*, 444 F.3d 417, 425 n.8 (5th Cir. 2006); *FDIC v. Abraham*, 137 F.3d 265, 268 (5th Cir. 1998).

As none of Sterling's arguments to the contrary are persuasive, we hold that Section 5.05(f) constituted a valid amendment to the Sterling Plan as of December 23, 1996, the date the APA was executed.

**B.     Section 5.05(f) was Assumed, Not Rejected, in Bankruptcy**

After determining that Section 5.05(f) of the APA constituted a valid amendment to the Sterling Plan, we must determine whether Section 5.05(f) was assumed or rejected in bankruptcy. This bankruptcy-related question was not before the *Halliburton* court, and the parties do not cite any precedent directly on point. However, the bankruptcy court's Confirmation Order, Sterling's Plan of Reorganization, and various provisions of the Bankruptcy Code help guide our analysis.

The bankruptcy court's Confirmation Order provided that all retiree benefits were "treated as executory contracts and assumed pursuant to [the Plan of Reorganization]." The Plan of Reorganization similarly provided that Sterling's various benefits plans were deemed to be and were treated as "executory contracts that [were] assumed under the Plan [of Reorganization]," and that nothing in the Plan of Reorganization modified the terms of such plans. Therefore, because Section 5.05(f) was part of the Sterling Plan beginning in 1996, it was expressly assumed by Sterling pursuant to both the Confirmation Order and Plan of Reorganization. Moreover, the Sterling Plan's terms—including the terms of Section 5.05(f)—were not modified by either the Confirmation Order or the Plan of Reorganization.

The only difficulty in the analysis is the fact that the APA was rejected by Sterling on November 13, 2002, and the Plan of Reorganization, which was

approved on November 20, 2002, and became effective December 19, 2002, provided that the Sterling Plan was assumed "[e]xcept to the extent (a) previously assumed or rejected by an order of the Bankruptcy Court on or before the Confirmation Date." Thus, it is theoretically possible that Section 5.05(f) fell within this exception and was rejected as part of the APA before it was assumed as part of the Sterling Plan. However, the distinction between (i) a contractual obligation between corporate parties, and (ii) an ERISA plan provision enforceable by plan participants, provides the best answer to this interpretive dilemma.

As noted above, Sterling provided no support for the idea that a provision in a corporate agreement must be *only* a contractual obligation or *only* an ERISA plan amendment and that it cannot be both. In fact, the district court in *Halliburton* specifically noted that the merger agreement "could be a plan modification, contractual commitment of Halliburton, or both. The distinction does not matter." *Halliburton Co. Benefits Comm. v. Graves*, No. Civ. A. H–04–280, 2004 WL 2938645 (S.D. Tex. Dec. 20, 2004). The correct answer in this case is "both," and the distinction does matter.

Sterling maintains that Section 5.05(f) was a contractual term bargained for to benefit Cytec and enforceable by Cytec and Sterling against each other. This is certainly true. Also true is the fact that the executory portions of the APA—i.e., those contractual terms still enforceable by Cytec and Sterling against each other—were expressly rejected by order of the bankruptcy court on November 13, 2002, prior to Sterling's assumption of the Sterling Plan. But simply because Section 5.05(f) was a contractual term that was enforceable between Cytec and Sterling until the APA was rejected in bankruptcy, does not necessarily mean that Section 5.05(f) was not also part of the Sterling Plan that was expressly assumed by order of the bankruptcy court. When Sterling rejected Section 5.05(f) of the APA, it was only rejecting its ongoing contractual obligation

to Cytec; it was not rejecting its separate and ongoing ERISA obligation to Plaintiffs. This is because Section 5.05(f) was incorporated into the Sterling Plan in 1996 by operation of law, creating an ERISA obligation completely separate from Sterling's and Cytec's contractual obligations to each other. As a plan amendment Section 5.05(f) was not an executory contract provision found in a corporate agreement; rather, it was part of the Sterling Plan enforceable by the plan participants. *See Halliburton*, 463 F.3d at 375–76. Sterling's rejection of the APA therefore had no effect on the Sterling Plan because the continued validity of the Sterling Plan's terms was not dependent on the continued validity of the APA.[4]

Sterling successfully argued below and continues to argue on appeal that neither Section 1114 nor Section 1129 of the Bankruptcy Code—both of which were cited in the Confirmation Order and Plan of Reorganization—restricted its ability to modify Plaintiffs' premium benefits during or following bankruptcy because the premium benefits (embodied by Section 5.05(f)) did not qualify as "retiree benefits" within the meaning of Section 1114. *See* 11 U.S.C. §§ 1114(a), 1129(a)(13). However, we need not determine whether Sterling and the district court are correct that Plaintiffs' premium benefits do not qualify as "retiree benefits." As discussed previously, Section 5.05(f) became part of the Sterling

---

[4] This is essentially an ERISA version of the common contractual practice of incorporation by reference. Once the Sterling Plan was amended to incorporate the language of Section 5.05(f), such language became part of the Sterling Plan without regard to what could happen to the APA in the future. The Sterling Plan's incorporation of Section 5.05(f) did not automatically tie the fate of that amendment to the fate of the APA. All that mattered was that the incorporation of Section 5.05(f)'s language satisfied the plan amendment formalities. The APA was simply the vehicle Sterling used to amend its ERISA plan; it was not the foundation upon which the amendment depended for its continued validity.

Additionally, that the bankruptcy court drew distinctions between garden variety executory contracts and other benefits programs and plans that were "deemed to be" and "treated as" executory contracts further indicates that there is a distinction between typical executory contracts and ERISA plan provisions that may have been initially contained in corporate agreements such as the APA.

No. 10-20493

Plan in 1996, and pursuant to its own terms Sterling could only modify such provision after obtaining Cytec's prior written consent. Sterling admits that it never received prior written consent to increase Plaintiffs' premiums. Therefore, for these purposes, it does not matter whether or not Sterling's ability to modify the premium benefit during or after bankruptcy was restricted by either Section 1114 or Section 1129 because its ability to modify premiums was already restricted by the Sterling Plan's own terms.[5]

Finally, Sterling's argument that maintaining Section 5.05(f) as part of the Sterling Plan is not workable after the other provisions in the APA were rejected lacks legal support and fails as a practical matter. Sterling cites to no case law supporting the idea that if a term of an ERISA plan becomes more difficult to comply with, it becomes, in Sterling's words, "a nullity." Section 5.05(f)'s requirement that Sterling receive prior written consent from Cytec in order to raise the Sterling Plan premiums may make Sterling's compliance more difficult because Cytec's and Sterling's mutual contractual obligations were severed in bankruptcy (at Sterling's request), but it does not make the provision completely unworkable. Sterling is in no way prevented from requesting information from Cytec regarding Cytec's relevant retiree plan premiums, or from requesting written consent from Cytec when Sterling seeks to raise its own premiums. It is possible that Sterling will have to negotiate (and possibly pay) to obtain such information and consent from Cytec in the future (thereby creating new contractual obligations), but this business development and potential additional cost to Sterling has no effect on Plaintiffs' rights under ERISA to receive benefits under Section 5.05(f)'s terms.

---

[5] We also note that the bankruptcy court's approval of Sterling's rejection of the APA was not also approval—express or implied—of Sterling's later attempt to modify Plaintiffs' premium benefits without following the procedures required by Section 5.05(f)'s terms or by the Bankruptcy Code.

No. 10-20493

We find that the APA's rejection in bankruptcy did not destroy Section 5.05(f)'s status as a valid plan amendment, and that Section 5.05(f) was assumed in bankruptcy pursuant to Sterling's Plan of Reorganization.

## IV. CONCLUSION

"Employers generally are free under ERISA to modify or terminate plans, but if the plan sponsor cedes its right to do so, it will be bound by that contract." *Halliburton*, 463 F.3d at 378. Sterling voluntarily ceded its right to modify Plaintiffs' premiums when it entered into the APA and approved of Section 5.05(f)'s terms. We therefore hold that, pursuant to *Halliburton* and as a matter of law, Section 5.05(f) of the APA constituted a valid amendment to the Sterling Plan. We also hold that Section 5.05(f) was assumed and not rejected in bankruptcy and remained at all times a valid and enforceable provision of the Sterling Plan. Because Sterling was required to receive Cytec's prior written consent before it raised Plaintiffs' premiums, something it acknowledges it did not do, we REVERSE the order of the district court and REMAND for additional proceedings consistent with this opinion.