**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

Nos. 10-4147, 10-4279, 10-4791, 10-4792
_____

RONALD SHAVER; WILLIAM J. WHITNEY; JOE
FEDELE;
RALPH RIBERICH; ANTHONY P. KATZ, on behalf of
themselves
and others similarly situated,

v.

SIEMENS CORPORATION; SIEMENS WESTINGHOUSE
RETIREMENT
PLAN FOR UNION EMPLOYEES; SIEMENS
WESTINGHOUSE RETIREMENT PLAN,

Appellants in No. 10-4147
_____

RONALD SHAVER; WILLIAM J. WHITNEY; JOE
FEDELE;
RALPH RIBERICH; ANTHONY P. KATZ, on behalf of
themselves
and others similarly situated,

Appellants in No. 10-4279

v.

SIEMENS CORPORATION; SIEMENS WESTINGHOUSE
RETIREMENT
PLAN FOR UNION EMPLOYEES; SIEMENS
WESTINGHOUSE RETIREMENT PLAN

_____

RONALD SHAVER; WILLIAM J. WHITNEY; JOE
FEDELE;
RALPH RIBERICH; ANTHONY P. KATZ, on behalf of
themselves
and others similarly situated,

v.

SIEMENS CORPORATION; SIEMENS WESTINGHOUSE
RETIREMENT
PLAN FOR UNION EMPLOYEES; SIEMENS
WESTINGHOUSE RETIREMENT PLAN,

Appellants in No. 10-4791
_____

RONALD SHAVER; WILLIAM J. WHITNEY; JOE
FEDELE;
RALPH RIBERICH; ANTHONY P. KATZ, on behalf of
themselves
and others similarly situated,

Appellants in No. 10-4792

2

v.

SIEMENS CORPORATION; SIEMENS WESTINGHOUSE
RETIREMENT
PLAN FOR UNION EMPLOYEES; SIEMENS
WESTINGHOUSE RETIREMENT PLAN
_____

On Appeal from the United States District Court
for the Western District of Pennsylvania
(D.C. Civ. No. 2-02-01424)
District Judge:  Honorable David Stewart Cercone
_____

Argued December 15, 2011

BEFORE:  SLOVITER, VANASKIE, and GREENBERG,
Circuit Judges

(Filed: February 29, 2012)
_____

David B. Rodes (argued)
John T. Terney, III
Goldberg, Persky & White,
1030 Fifth Ave., Third Floor
Pittsburgh, PA 15219

William T. Payne
Stember, Feinstein, Doyle & Payne
1007 Mt. Royal Blvd.,

3

Pittsburgh, PA 15223

Attorneys for Appellees-Cross Appellants
Ronald Shaver, William Whitney,
Joe Fedele, Ralph Riberich,
and Anthony Katz, on behalf
of themselves and others similarly situated

Frederick W. Bode, III
Thomas H. May
Dickie, McCarney & Chilcote
Two PPG Place
Suite 400
Pittsburgh, PA 15222

David F. Dobbs
Dana L. Rust
Robert F. Holland
McGuire Woods
One James Center
901 East Cary Street
Richmond, VA 23219

Charles A. Rothfield (argued)
Michael B. Kimberly
Mayer Brown
1999 K Street, NW
Washington, DC 20006

Lauren R. Goldman
Mayer Brown

1675 Broadway
New York, NY 10019

Attorneys for Appellants-Cross Appellees
Siemens Corporation, Siemens
Westinghouse Retirement Plan for
Union Employees, and Siemens Westinghouse
Retirement Plan

Christopher J. Rillo
Schiff Hardin
One Market Street
Spear Street Tower, Suite 3200
San Francisco, CA 94105

Bradford P. Campbell
Suzanne M. Arpin
Diane M. Soubly
Schiff Hardin
1666 K Street, NW, Suite 300
Washington, DC 20006

Janet Jacobson
American Benefits Council
1501 M Street NW
Suite 600
Washington, DC 20005

Attorneys for Amici Curiae
American Benefits Council,
National Association of

Manufacturers, and
Chamber of Commerce of
the United States

_____

OPINION OF THE COURT

_____

GREENBERG, Circuit Judge.

## I. INTRODUCTION

This matter comes on before this Court on four consolidated appeals and cross-appeals from an order of the District Court dated March 29, 2007, and entered on March 30, 2007, denying defendants' motion for summary judgment and granting in part and denying in part plaintiffs' cross-motion for summary judgment. See Shaver v. Siemens Corp., No. 2:02cv1424, 2007 WL 1006681 (W.D. Pa. Mar. 29, 2007). Plaintiffs, now the appellees/cross-appellants in this appeal,[1] Ronald Shaver, William Whitney, Joe Fedele, Ralph Riberich, and Anthony Katz, on behalf of themselves and others similarly situated, brought this class action against defendants, now appellants/cross-appellees, Siemens Corporation ("Siemens"), appellees' former employer, and its retirement plans, Siemens Westinghouse Retirement Plan for Union Employees and Siemens Westinghouse Retirement Plan, alleging that those

_____

[1]As a matter of convenience, we refer to plaintiffs simply as "appellees."

6

entities violated the Employee Retirement Income Security Act of 1974 ("ERISA") by refusing to provide appellees with Permanent Job Separation pension benefits ("PJS benefits") when Siemens terminated their employment. Appellees' action has been partially successful in the District Court but remains unresolved as to the rest of the case. For the reasons that follow, we will reverse on one of Siemens' appeals to the extent that the District Court denied it summary judgment for we conclude that Siemens was entitled to summary judgment on the entire case with respect to all appellees, and we will remand the case to the District Court for entry of judgment in favor of Siemens and its retirement plans. Entry of the order on the remand will bring this litigation to a close with respect to the substantive matters at issue.[2]

## II. FACTUAL and PROCEDURAL HISTORY

On November 14, 1997, Westinghouse Electric Corporation ("Westinghouse")[3] agreed to sell its Power Generation Business Unit ("PGBU") to Siemens in a transaction to be effectuated through an Asset Purchase Agreement ("APA"). There was, however, a delay in the consummation of the transaction, and Siemens and Westinghouse did not execute

[2]It is possible that the District Court will need to enter orders on some housekeeping matters such as the imposition of costs.

[3]Subsequently, Westinghouse changed its name to CBS, Inc., and it is now known as Viacom, Inc.

the APA until approximately nine months later, on August 19, 1998. As the APA contemplated, Siemens hired all Westinghouse PGBU employees who, on August 19, 1998, had been working actively, were on vacation, or were on short-term disability ("legacy employees"). Appellees are 227 legacy employees who transferred employment from Westinghouse to Siemens.

At the time that Siemens and Westinghouse executed the APA, Westinghouse sponsored and maintained a defined benefit pension plan for its employees, including the soon-to-be legacy employees (the "Westinghouse Plan"). Under section 19 of the Westinghouse Plan, employees who satisfied certain age and service requirements, but did not qualify for normal retirement benefits, and who were terminated by an "Employer, an Affiliated Entity, or Excluded Unit because of job movement or product line relocation or location closedown" were entitled to PJS benefits. J.A. 292, 345. Stated succinctly, PJS benefits provide for payment of an employee's normal retirement benefit without actuarial reduction prior to normal retirement age, an additional monthly payment of $10.00 multiplied by the employee's years of credited service if the employee's special retirement date[4] was on or before January 1, 1995, and an additional monthly payment of $100.00 if the employee had 25 years of eligibility service and his special retirement date was on

_____

[4]A plan participant's special retirement date under section 19 of the Westinghouse Plan is the first day of the month following the month in which Westinghouse terminates the participant's employment due to job movement, product line relocation, or location closedown.

or before January 1, 1995. See id. 345-50. As we later will explain, it is highly significant that the Westinghouse Plan defined an "Employer, Affiliated Entity, or Excluded Unit" as Westinghouse or any Westinghouse subsidiary or joint venture participating in the Westinghouse Plan. Id. 284, 288, 292. The definition did not, however, include any future employer, here Siemens, of Westinghouse employees.

The Westinghouse Plan also contained two critical express limitations on the availability of PJS benefits: (1) a provision providing that "in no event shall a Permanent Job Separation occur if an Employee is offered continued employment by . . . a successor employer," and (2) a so-called "sunset provision" providing that "[i]n no event shall a Permanent Job Separation occur after August 31, 1998." Id. 293. Thus, in the absence of an amendment of the Westinghouse Plan, the plan would not provide for PJS benefits to an employee offered employment by a successor to Westinghouse, as happened here, or by reason of a separation after August 31, 1998, as was also the case here.

The APA included many specific provisions governing the pensions and benefits of the legacy employees, which, so far as germane to this appeal, we explain in more detail below. At its broadest, however, the APA required that Siemens establish a defined benefit pension plan for the legacy employees "that contain[ed] terms and conditions that are substantially identical with respect to all substantive provisions to those of the Westinghouse Pension Plan as in effect as of the Closing Date" of the APA and that Siemens was to provide "compensation and benefit plans and arrangements which in the aggregate are

9

comparable" to those of the Westinghouse Plan as of the closing date. Id. 137-38. Thus, Westinghouse and Siemens contemplated that the pension benefits for legacy employees essentially would continue unabated after consummation of the sale of the PGBU. There is, however, no suggestion in the APA or in any other document elsewhere in the record that Westinghouse and Siemens contemplated that the consummation of the sale would result in enhancement of the legacy employees' pension benefits.

Although Westinghouse and Siemens did not execute the APA until August 19, 1998, prior to that date they adopted an amendment to the APA that provided that the closing date of the APA, though only for the purpose of pensions and benefits, would be September 1, 1998.[5] In the same amendment

---

[5] The District Court found and the parties agree that Siemens and Westinghouse amended the APA to alter the closing date for pension and benefit purposes to September 1, 1998. In reality, however, the amendment was more specific than that and provided that "[a]ll references to 'Closing Date' in [s]ections 5.5(d), (e) and (h) shall be changed to September 1, 1998." J.A. 154. In fact, however, there are provisions of the APA that deal with pensions and benefits that are not within the sections enumerated above. In particular, sections 5.5(a) and 2.3(a) implicate pensions and benefits. In light of the parties' long-standing agreement as to the import of the amendment, however, and for ease of reference, we insert September 1, 1998, as the closing date for all APA provisions dealing with pensions and benefits. We note, however, that the precise closing date of the APA is potentially relevant only as to our discussion in section

10

Westinghouse and Siemens also amended the APA to provide that Westinghouse would amend its pension plan to offer the legacy employees, though only for benefit accrual purposes, credit for service and compensation from August 19 through August 31, 1998, even though Siemens would become their employer as of August 19. In turn, Siemens agreed not to terminate any legacy employee other than for cause prior to September 1, 1998, and agreed that if it nevertheless did so it would "reimburse [Westinghouse] for any actuarial pension loss caused by any such termination." Id. 156. Thereafter, Westinghouse amended its plan to reflect this amendment to the APA.

On October 29, 1998, Siemens adopted separate but virtually identical defined benefit pension plans for union and non-union employees, which were made effective retroactively to September 1, 1998, the plans thereby becoming activated as of the time the Westinghouse Plan no longer would give the legacy employees credit for service and compensation. Consequently, the consummation of the Westinghouse-Siemens transaction left the legacy employees in the same position in which they had been prior to the closing of the transaction with regard to PJS benefits because under the Westinghouse Plan

---

V(B)(3)(b) of this opinion concerning whether the APA contractually required Siemens to offer PJS benefits. We thus only address the disparate closing dates in that section of our decision and note that inserting August 19, 1998, as the closing date of the APA into sections 5.5(a) and 2.3(a) does not alter the outcome of this case.

11

separation from service after August 31, 1998, could not result in a terminated employee being eligible for PJS benefits.

As we have indicated, notwithstanding the sale of the PGBU to Siemens and the adoption of the Siemens Plans, after execution of the APA and to this day, the Westinghouse Plan has remained in existence and it continues to provide legacy employees the pension benefits they accrued under the Westinghouse Plan. Legacy employees who qualify for benefits thus receive two pension payments: one from the Westinghouse Plan for benefits accrued prior to September 1, 1998, and another from a Siemens Plan for benefits accrued from September 1, 1998 forward.[6]

In 1999, Siemens closed certain PGBU facilities and consequently terminated the employment of numerous legacy employees, including the appellees in this case. Upon their termination, 207 of the 227 appellees signed severance agreements in which they released Siemens from liability and promised not to sue it for any claims related to or arising out of their employment or termination. In exchange for their signing the agreement, Siemens paid the signatories varying amounts of severance pay. Though the validity of the releases was a major issue in the District Court, as will be seen we need not address that issue on this appeal. Notwithstanding having executed these releases, in March 2002 appellees submitted claims to the

---

[6]As explained below, however, there are certain benefits which are considered to have "accrued" for purposes of ERISA section 204(g) prior to September 1, 1998, for which Westinghouse is no longer liable.

Siemens Plans for PJS benefits, but the Siemens Plans' administrative committees denied those claims on the ground that neither Plan provided for PJS benefits, an undoubtedly correct decision so far as the terms of the Siemens Plans were concerned.

On August 15, 2002, appellees filed a complaint in the District Court against Siemens and the Siemens Plans, alleging that those entities' denial of their claims for PJS benefits violated ERISA. The Court assigned the case to a Magistrate Judge for pretrial proceedings in accordance with the Magistrate Act, 28 U.S.C. § 636(b)(1)(A). Following discovery, the parties filed cross-motions for summary judgment, which led to the Magistrate Judge's filing a report and recommendation on December 13, 2005, with the District Court. After the parties filed objections and responses, the Court entered the order which is the subject of this appeal.

The Magistrate Judge recommended that the District Court grant appellees' motion as to the 20 class members who had not signed releases (the "Non-Release Plaintiffs") and grant Siemens' motion as to the 207 members who had signed releases (the "Release Plaintiffs"). The Magistrate Judge concluded that Siemens violated ERISA sections 208, 29 U.S.C. § 1058, and 204(g), 29 U.S.C. § 1054(g), a decision she based on two theories which we address in detail below. The Magistrate Judge determined, however, that Siemens had satisfied its initial burden with respect to the Release Plaintiffs of proving the waivers' validity and further determined that appellees had failed to provide evidence that they did not knowingly and voluntarily execute the waivers. Consequently, the Magistrate

Judge recommended that the Court grant summary judgment in Siemens' favor with respect to the Release Plaintiffs. Thus, the gravamen of the Magistrate Judge's recommendation was that Siemens wrongfully denied all appellees PJS benefits but to the extent that appellees had waived their PJS claims by executing the severance agreements including releases of their PJS claims Siemens avoided liability.

The parties filed cross-objections and responses in the District Court to the report and recommendation as both sides were satisfied in part and dissatisfied in part with the report and recommendation. On March 29, 2007, the Court granted appellees' summary judgment motion with respect to the Non-Release Plaintiffs and denied summary judgment to Siemens as to both classes of plaintiffs. Apparently adopting both of the Magistrate Judge's theories of liability, the Court determined that Siemens violated ERISA in denying PJS benefits and that in the absence of their signing releases all appellees would be entitled to PJS benefits. The Court denied summary judgment to appellees as to the Release Plaintiffs, as it concluded that a determination of whether they knowingly and voluntarily waived their right to bring their claims for PJS benefits required a fact-intensive inquiry inappropriate for resolution on summary judgment proceedings as there were material disputes of fact on the waiver issue.

The District Court entered a final judgment pursuant to Federal Rule of Civil Procedure 54(b) on October 15, 2010, awarding the Non-Release Plaintiffs approximately $2 million in damages but denying a claim they asserted for certain retiree health and life insurance benefits that they contended should

14

accompany PJS benefits.[7] On October 15 the Court certified the portion of its March 29, 2007 opinion and order denying appellees' motion for summary judgment as to the Release Plaintiffs for interlocutory appeal pursuant to 28 U.S.C. § 1292(b). The Court also certified for interlocutory appeal Siemens' appeal from the Court's denial of its motion for summary judgment with respect to the Release Plaintiffs. The Court characterized the issue for the proposed interlocutory appeals as whether the Release Plaintiffs' claim to PJS benefits could be waived as a matter of law and, if so, what proof must be presented to demonstrate that there had been a valid waiver. Both appellees and Siemens petitioned in this Court for permission to appeal, and on December 13, 2010, we granted both petitions. These appeals followed.[8]

## III. JURISDICTION and STANDARD of REVIEW

The District Court had jurisdiction under 28 U.S.C. § 1331 and 29 U.S.C. § 1132(e) and (f). We have jurisdiction

[7]Inasmuch as we determine that appellees are not entitled to the PJS benefits we do not address their claim that they are entitled to attendant health and life insurance benefits.

[8]The parties filed four separate appeals but we have no need to explain their procedural history in more detail as we have consolidated them and our opinion in this consolidated case will bring these appeals and this litigation in its entirety to a substantive close.

15

over the parties' cross-appeals of the District Court's entry of final judgment as to the Non-Release Plaintiffs pursuant to 28 U.S.C. § 1291 and over the interlocutory appeals with respect to the Release Plaintiffs pursuant to 28 U.S.C. § 1292(b).

"We exercise plenary review of a district court's order granting or denying summary judgment, applying the same standard as the district court . . . ." Tri-M Grp., LLC v. Sharp, 638 F.3d 406, 415 (3d Cir. 2011). We will affirm only if "drawing all reasonable inferences in favor of the nonmoving party, there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law." Id. (quoting Ruehl v. Viacom, Inc., 500 F.2d 375, 380 n.6 (3d Cir. 2007)). Because the District Court adopted in substance the Magistrate Judge's report and recommendation, with the modifications we have set forth, in most respects effectively we are reviewing the Magistrate Judge's proposed disposition of the case. We thus reference primarily the Magistrate Judge's report and recommendation rather than the opinion of the District Court though to a degree we treat the documents interchangeably.

## IV. LEGAL BACKGROUND

Due to the complexity of this ERISA case, we think it best to set forth the background legal framework that governs this matter before we turn to a review of the District Court's disposition of this case. We start from the core principle that it is well-established that "ERISA does not mandate the creation

16

of pension plans." Dade v. North Am. Philips Corp., 68 F.3d 1558, 1561 (3d Cir. 1995). "Nor does ERISA mandate what kind of benefits employers must provide if they choose to have such a plan." Lockheed Corp. v. Spink, 517 U.S. 882, 887, 116 S.Ct. 1783, 1788 (1996); see also Smith v. Contini, 205 F.3d 597, 602 (3d Cir. 2000) ("ERISA neither mandates the creation of pension plans nor in general dictates the benefits to be afforded once a plan is created."). Instead, Congress enacted ERISA to ensure that "if a worker has been promised a defined pension benefit upon retirement — and if he has fulfilled whatever conditions are required to obtain a vested benefit — he will actually receive it." Spink, 517 U.S. at 887, 116 S.Ct. at 1788 (internal quotation marks omitted). Thus, "[o]nly the plan itself can create an entitlement to benefits." Bellas v. CBS, Inc., 221 F.3d 517, 522 (3d Cir. 2000). "Accordingly, we are required to enforce the [p]lan as written unless we find a provision of ERISA that contains a contrary directive." Dade, 68 F.3d at 1562; see also Smith, 205 F.3d at 602 (same).[9]

By their plain terms, the Siemens Plans do not provide for PJS benefits. The Magistrate Judge found, however, that ERISA sections 208 and 204(g) controlled the transactions that led to the creation of the Siemens Plans and that by reason of

[9]In point of fact, since Congress originally adopted ERISA it has from time to time amended the statute to limit plan sponsors' power to determine the ERISA benefits and collective bargaining agreements sometimes also address plans' benefits. But the basic principle that the employer determines the benefits remains.

those sections appellees are entitled to PJS benefits.  We thus turn to those provisions.

> ERISA section 208 provides, in relevant part:
> A pension plan may not merge or consolidate with, or transfer its assets or liabilities to, any other plan after September 2, 1974, unless each participant in the plan would (if the plan then terminated) receive a benefit immediately after the merger, consolidation, or transfer which is equal to or greater than the benefit he would have been entitled to receive immediately before the merger, consolidation, or transfer (if the plan had then terminated).

29 U.S.C. § 1058.  In Gillis v. Hoechst Celanese Corp., 4 F.3d 1137, 1150 (3d Cir. 1993), then-Judge Alito summarized in his concurring opinion the operation of section 208:

> [Section 208 and its Internal Revenue Code counterpart, 26 U.S.C. § 414(l)[10]] require us

---

[10]"When Title I of ERISA was enacted to impose substantive legal requirements on employee pension plans (including the anti-cutback rule), Title II of ERISA amended the Internal Revenue Code to condition the eligibility of pension plans for preferential tax treatment on compliance with many of the Title I requirements." Central Laborers' Pension Fund v. Heinz, 541 U.S. 739, 746, 124 S.Ct. 2230, 2236-37 (2004). "The result was a 'curious duplicate structure' with nearly verbatim replication in the Internal Revenue Code of whole sections of text from

to compare (a) the benefits, if any, that the [participants] would have received if the [original] [p]lan had terminated just before the [merger or transfer] . . . with (b) the benefits, if any, that the [participants] would have received if the [successor] [p]lan had terminated just after the [merger or] transfer.

In order to determine the benefits that the [participants] would have received upon termination of the plans at these two points in time, it is necessary to look to Section 4044 of ERISA, 29 U.S.C. § 1344, which prescribes the order in which the assets of a single-employer defined benefit plan are allocated among participants and beneficiaries at termination. The effect of all of these provisions — 26 U.S.C. § 414(l) and 29 U.S.C. §§ 1058 and 1344 — when read together [is] to require that any allocation of assets to the [participants'] early retirement benefits that would have occurred upon termination of the [original] [p]lan just before the [merger or] transfer not exceed the allocation of

Title I of ERISA." Id., 124 S.Ct. at 2237. Section 208 is replicated in 26 U.S.C. § 414(l) and section 204(g) in 26 U.S.C. § 411(d)(6). When interpreting ERISA, we thus take guidance from the parallel provisions of the Internal Revenue Code, along with Treasury regulations and Revenue Rulings implementing and interpreting those provisions. See Gillis, 4 F.3d at 1144.

assets to those benefits that would have occurred upon termination of the [successor] [p]lan just after the [merger or] transfer.

Id. Thus, section 208 essentially requires that a plan participant receive no less benefits upon a hypothetical termination of the successor plan just following the merger or transfer of assets or liabilities than the participant would have received upon a hypothetical termination of his or her original plan just prior to the merger or transfer.

Section 204(g), known as the anti-cutback rule, "prohibits an employer from decreasing or eliminating a participant's accrued benefits by plan amendment." Bellas, 221 F.3d at 522. Thus, section 204(g) follows the principles of section 208 in protecting plan participants. In the case of a defined benefit plan, ERISA defines, in a somewhat circular fashion, an "accrued benefit" as a participant's "accrued benefit determined under the plan and . . . expressed in the form of an annual benefit commencing at normal retirement age." 29 U.S.C. § 1002(23)(A). Because early retirement benefits by definition commence prior to normal retirement age, those benefits were not considered "accrued" under ERISA prior to 1984. See Bellas, 221 F.3d at 523 n.2 (citing Bencivenga v. Western Pa. Teamsters and Emp'rs Pension Fund, 763 F.2d 574, 577 (3d Cir. 1985)). In 1984, however, Congress amended section 204(g) and extended the protection it afforded to early retirement benefits and retirement-type subsidies. See Retirement Equity Act of 1984, Pub. L. No. 98-397, § 301(a)(2), 98 Stat. 1426, 1450-51. As amended, section 204(g) now provides:

20

(g)     Decrease of accrued benefits through amendment of plan

(1) The accrued benefit of a participant under a plan may not be decreased by an amendment of the plan, other than an amendment described in section 1082(d)(2) or 1441 of this title.

(2) For purposes of paragraph (1), a plan amendment which has the effect of –

(A)    eliminating or reducing an early retirement benefit or a retirement-type subsidy (as defined in regulations), or

(B) eliminating an optional form of benefit,

with respect to benefits attributable to service before the amendment shall be treated as reducing accrued benefits.    In the case of a retirement-type subsidy, the preceding sentence shall apply only with respect to a participant who satisfies (either before or after the amendment) the preamendment conditions for the subsidy.

21

29 U.S.C. § 1054(g).

Although section 204(g) prohibits cutback of accrued benefits by plan amendment, a determination under section 208 of a participant's pension and benefits entitlement on a hypothetical termination basis requires that a court also consider section 204(g) because a plan termination is regarded as an "amendment" for the purposes of section 204(g). See Gillis, 4 F.3d at 1145. As Judge Alito observed in his concurring opinion in Gillis, "[w]hile neither [s]ection 204(g) of ERISA nor [s]ection 414(l) of the Internal Revenue Code expressly states that a termination must be regarded as an amendment for these purposes," the Internal Revenue Service has concluded in a Revenue Ruling that plan terminations are subject to the provisions of section 204(g). Id. at 1150 (Alito, J., concurring) (citing Revenue Ruling 85-6). Furthermore, the Treasury regulations implementing the Internal Revenue Code counterpart to ERISA section 204(g), 26 U.S.C. § 411, provide that "[t]he prohibition against the reduction or elimination of section 411(d)(6) protected benefits already accrued applies to plan mergers, spinoffs, transfers, and transactions amending or having the effect of amending a plan or plans to transfer plan benefits." 26 C.F.R. § 1.411(d)-4, A-2(a)(3)(i).[11]

---

[11]As we observed in Dade, "the legislative history of the 1984 amendments indicates that Congress intended early retirement benefits to have the same protection in a plan termination that they would have in an amendment." 68 F.3d at 1563 n.2 (citing, e.g., S. Rep. No. 98-575, at 31, reprinted in 1984 U.S.C.C.A.N. 2547, 2577) ("Terminated Plans: The bill does not provide an exception to the prohibition against reduction of benefits or

Those Treasury regulations apply with equal force to section 204(g). 29 U.S.C. § 1202(c) ("Regulations proscribed by the Secretary of the Treasury under sections 410(a), 411, and 412 of Title 26 . . . shall also apply to [their ERISA counterparts]."); see also Heinz, 541 U.S. at 746-47, 124 S.Ct. at 2237 (observing that section 411 regulations are applicable to section 204(g)). Accordingly, a plan participant's benefits protected by section 204(g) under a plan amendment must be preserved and funded upon a hypothetical termination under section 208 and thus not decreased or eliminated by virtue of a plan merger or a transfer of assets or liabilities.

The present case is unusual in that we already have had occasion to consider whether section 204(g) protects the precise benefits at issue here. In Bellas, a former employee brought suit against Westinghouse, by then CBS, and the Westinghouse Pension Plan, contending that certain amendments to the plan that narrowed the class of persons eligible for PJS benefits and enacted the sunset provision present also in the Westinghouse Plan at issue in this case violated ERISA section 204(g). 221 F.3d at 520-21. On interlocutory appeal, we considered whether the PJS benefits constituted an early retirement benefit or retirement-type subsidy protected by section 204(g). Id. at 518. At that time, the Treasury had not, as section 204(g)

---

elimination of benefits options in the case of a terminated plan. Accordingly, a plan is not to be considered to have satisfied all of its liabilities to participants and beneficiaries until it has provided for the payment of contingent liabilities with respect to a participant who, after the date of the termination of a plan, meets the requirements for a subsidized benefit.").

23

contemplated that it would do, promulgated regulations defining these terms. Id. at 524.

We first noted that "[b]ecause the $10.00 multiplied by [c]redited [s]ervice and the additional $100.00 benefit do not continue beyond normal retirement age, they cannot properly be considered a retirement-type subsidy as contemplated by section 204(g)," and thus "could be the subject of amendment or elimination without violating section 204(g)." Id. at 536 n.17.[12] Turning to the early payment of unreduced normal retirement benefits, we concluded that the portion of the PJS benefits that continues beyond normal retirement age and "that is equal to the actuarially reduced normal retirement benefit, constitutes an early retirement benefit protected by section 204(g) but is not a retirement-type subsidy," and that the value of the PJS benefits that continue beyond normal retirement age "over and above the actuarially reduced value" is a retirement-type subsidy protected by section 204(g). Id. at 538.[13] We further determined that

[12]The district court in Bellas did not separately address this portion of the PJS benefits in its opinion nor do the parties here separately address these benefits in their briefs. The distinction is of no consequence in the case at bar, however, as our holding applies to all facets of the PJS benefits.

[13]In 2006, the Secretary of the Treasury enacted regulations defining these and other relevant terms for ERISA. Those regulations define "early retirement benefit" and "retirement-type subsidy" in the same manner as we did in Bellas. See 26 C.F.R. § 1.411(d)-3(g)(6)(i) ("The term early retirement benefit means the right, under the terms of the plan, to commence

those benefits "are accrued upon their creation rather than upon the occurrence of the unpredictable contingent event [i.e., the plan shutdown]." Id. at 532. We accordingly held that section 204(g) protects the PJS benefits from cutback and therefore affirmed the district court's conclusion that Westinghouse violated section 204(g) through enactment of the amendments. Id. at 540. We also point out that, as we discuss at length below, in Bellas we invalidated the sunset provision as to Westinghouse.

## V.  ANALYSIS[14]

distribution of a retirement-type benefit at a particular date after severance from employment with the employer and before normal retirement age."); 26 C.F.R. § 1.411(d)-3(g)(6)(iii) ("The term retirement-type benefit means (A) [t]he payment of a distribution alternative with respect to an accrued benefit; or (B) [t]he payment of any other benefit under a defined benefit plan . . . that is permitted to be in a qualified pension plan, continues after retirement, and is not an ancillary benefit."); 26 C.F.R. § 1.411(d)-3(g)(6)(iv) ("The term retirement-type subsidy means the excess, if any, of the actuarial present value of a retirement-type benefit over the actuarial present value of the accrued benefit commencing at normal retirement age or at actual commencement date, if later, with both such actuarial present values determined as of the date the retirement-type benefit commences.").

[14]At the outset of our analysis, we note that the Court of Appeals

25

As we have already noted, the Magistrate Judge reached her conclusion that ERISA required Siemens to offer PJS benefits on the basis of two independent theories. First, the Magistrate Judge determined that Siemens created an ERISA "transition" plan for the legacy employees through the extension of the Westinghouse Plan from August 19 to August 31, 1998. See Shaver, 2007 WL 1006681, at *21-23. The Magistrate Judge concluded that adoption of the Siemens Plans functioned as an amendment of the ERISA "transition" plan and the amendment eliminated the legacy employees' PJS benefits in violation of section 204(g). See id., at *24-27.

Second, the Magistrate Judge determined that Westinghouse transferred to Siemens through the APA a portion of Westinghouse Plan's liabilities, thereby triggering the

for the Eleventh Circuit in a not precedential opinion has weighed in on the Westinghouse-Siemens transaction in a factually-indistinguishable case and determined that the legacy employees are not entitled to PJS benefits. See McCay v. Siemens Corp., 247 F. App'x 172 (11th Cir. 2007). In accordance with our practice, however, we do not rely on that opinion as it is not precedential. We nevertheless make reference to McCay because we think that it is important to note that Siemens does not contend that principles of claim or issue preclusion compel us to follow that case and thus we do not address that possibility. In this regard, we point out that not precedential opinions no less than precedential opinions can have preclusive effect.

applicability of section 208.  See id., at *20.  The Magistrate Judge appeared to conclude that independently of section 204(g), section 208 required that the Siemens Plans "provide equal or greater benefits" than those of the Westinghouse Plan.  See id., at *27.  Turning to section 204(g), the Magistrate Judge concluded also that in light of our holding in Bellas that PJS benefits under the Westinghouse Plan are protected from cutback, section 204(g) also required that Siemens offer PJS benefits.  Id., at *27-28.

We first consider whether Siemens established an ERISA "transition" plan, the less complex of the two theories.  We then proceed to the hyper-complicated question of the applicability of ERISA sections 208 and 204(g).

A.  AN ERISA TRANSITION PLAN

ERISA applies to "any employee benefit plan if it is established or maintained . . . by any employer engaged in commerce . . . ." 29 U.S.C. § 1003(a).  Surprisingly, however, ERISA does not define the term "plan."  In the absence of a congressional definition, we have "adopted the test developed in Donovan v. Dillingham, 688 F.2d 1367 (11th Cir. 1982) (en banc), to determine whether informal written or oral communications . . . constitute a plan."  Smith v. Hartford Ins. Grp., 6 F.3d 131, 136 (3d Cir. 1993) (citing Deibler v. United Food & Commercial Workers' Local Union 23, 973 F.2d 206, 209 (3d Cir. 1992); Henglein v. Informal Plan For Plant Shutdown Benefits, 974 F.2d 391, 399-400 (3d Cir. 1992)).  Under Donovan, an ERISA plan "is established if from the surrounding circumstances a reasonable person can ascertain the

27

intended benefits, a class of beneficiaries, the source of financing, and procedures for receiving benefits." 688 F.2d at 1373. Looking to these factors, the Magistrate Judge concluded that Siemens adopted an ERISA "transition" plan for the thirteen-day period from August 19 to August 31, 1998, by virtue of Westinghouse's extension of its pension plan to cover the legacy employees during that time.

Siemens challenges this conclusion on multiple grounds. It contends that ERISA plans are permanent or at least long-term programs and that the patently temporary nature of the thirteen-day extension precludes it from being classified as an ERISA plan. Appellants' br. at 53-54. Siemens also contends that even if a temporary extension of one ERISA plan could qualify as the establishment of a second and distinct ERISA plan, Westinghouse — not Siemens — was the plan sponsor and administrator during the thirteen-day period. Id. at 54-55. In this vein, Siemens points to the facts that Westinghouse was liable for any benefits that came due to a beneficiary under the plan during the thirteen-day period and Siemens' only obligation with respect to that period was to reimburse Westinghouse for any actuarial pension losses caused by Siemens' termination of a legacy employee without cause during that time. Id. at 56.

For the thirteen-day period at issue, a reasonable person could have ascertained the benefits under the Westinghouse Plan, identified the beneficiaries, the source of financing, and procedures for receiving benefits. We thus concur with the Magistrate Judge and, by extension with the District Court, that there was an ERISA plan in place from August 19 to August 31, 1998, for the legacy employees. The critical question, however,

28

is not whether there was a sponsor maintaining an ERISA plan during the thirteen-day period; it is whether Siemens "established or maintained" that plan, 29 U.S.C. § 1003(a), i.e., whether, in ERISA parlance, Siemens was the "plan sponsor," see 29 U.S.C. § 1002(16)(B).

The District Court found that Siemens maintained the plan because it determined that Siemens had administrative and financial responsibilities with respect to the plan during the thirteen-day period. But in reaching this conclusion, the Court relied solely on the fact that Siemens was obligated to reimburse Westinghouse for any actuarial pension loss that Siemens' termination of a legacy employee caused during the period. We, however, are satisfied that, contrary to the District Court's conclusion, Siemens' duty to reimburse Westinghouse for any losses that Siemens caused by termination of a legacy employee from August 19 to August 31, 1998, demonstrates quite clearly that Siemens was not responsible for the pension obligations that came due during this time period under the Westinghouse Plan. In fact, there is no factual dispute that at all times of the Westinghouse Plan's existence, including the thirteen-day period, Westinghouse has been and is currently responsible for the maintenance, administration, and funding of its plan. Siemens' singular promise of reimbursement to Westinghouse in the event that Siemens terminated a legacy employee describes the entirety of Siemens' obligations in relation to the Westinghouse Plan from August 19 to August 31, 1998, and plainly does not constitute the administrative undertaking that an ERISA plan requires. After all, an obligation to make payments to a plan sponsor cannot possibly be equated with the obligations attendant to establishing or maintaining a plan.

29

On this issue, we take instruction from the Supreme Court's seminal ERISA opinion in Fort Halifax Packing Co. v. Coyne, 482 U.S. 1, 107 S.Ct. 2211 (1987), in which the Court considered an ERISA preemption claim. Under ERISA, any state law that "relate[s] to any employee benefit plan described in [section] 1003(a)" is preempted. 29 U.S.C. § 1144(a). In Fort Halifax, the Court considered whether ERISA preempted a Maine statute requiring employers to provide a one-time severance payment to employees in the event of a plant closing. 482 U.S. at 4-5, 107 S.Ct. at 2213-14. The Court concluded that ERISA did not preempt the Maine statute because it was not an ERISA "plan," and in this regard stated:

> The requirement of a one-time, lump-sum payment triggered by a single event requires no administrative scheme whatsoever to meet the employer's obligation. The employer assumes no responsibility to pay benefits on a regular basis, and thus faces no periodic demands on its assets that create a need for financial coordination and control. Rather, the employer's obligation is predicated on the occurrence of a single contingency that may never materialize. The employer may well never have to pay the severance benefits. To the extent that the obligation to do so arises, satisfaction of that duty involves making a single set of payments to employees at the time the plant closes. To do little more than write a check hardly constitutes the operation of a benefit plan. Once this single

> event is over, the employer has no further
> responsibility. The theoretical possibility of a
> one-time obligation in the future simply creates
> no need for an ongoing administrative program
> for processing claims and paying benefits.

Id. at 12, 107 S.Ct. at 2218 (emphasis in original). Fort Halifax thus makes clear that the payment of benefits "do[es] not implicate ERISA unless [it] require[s] the establishment and maintenance of a separate and ongoing administrative scheme." Angst v. Mack Trucks, Inc., 969 F.2d 1530, 1538 (3d Cir. 1992); see also Kulinski v. Medtronic Bio-Medicus Inc., 21 F.3d 254, 257 (8th Cir. 1994) ("The pivotal inquiry is whether the plan requires the establishment of a separate, ongoing administrative scheme to administer the plan's benefits.").

To contrast with the simplicity of the single payment that the statute that the Court considered in Fort Halifax required, the Court provided substantial guidance on what constitutes an ERISA "administrative scheme," an obligation that goes far beyond making a single payment. The Court elaborated:

> An employer that makes a commitment
> systematically to pay certain benefits undertakes a
> host of obligations, such as determining the
> eligibility of claimants, calculating benefit levels,
> making disbursements, monitoring the availability
> of funds for benefit payments, and keeping
> appropriate records in order to comply with
> applicable reporting requirements.

31

482 U.S. at 9, 107 S.Ct. at 2216. Thus, an ERISA administrative scheme "may arise where the employer, to determine the employee's eligibility for and level of benefits, must analyze each employee's particular circumstances in light of the appropriate criteria." Kulinski, 21 F.3d at 257; Bogue v. Ampex Corp., 976 F.2d 1319, 1323 (9th Cir. 1992) (An ERISA "administrative scheme" is one in which "the circumstances of each employee's termination [are] analyzed in light of [certain] criteria.") (internal quotation marks and citation omitted). Factors relevant to determining whether an employer's undertakings have created an ERISA plan also include whether the "undertaking requires managerial discretion, that is, whether the undertaking could not be fulfilled without ongoing, particularized, administrative, analysis of each case" and whether "a reasonable employee would perceive an ongoing commitment by the employer to provide some employee benefits." Kosakow v. New Rochelle Radiology Assocs., 274 F.3d 706, 737 (2d Cir. 2001) (internal quotation marks and citation omitted). On the other hand, "[s]imple or mechanical determinations do not necessarily require the establishment of such an administrative scheme." Kulinski, 21 F.3d at 257.

The narrow scope of Siemens' obligations with respect to the thirteen-day period when considered against the "administrative scheme" analysis of Fort Halifax makes it quite clear that Siemens did not establish or maintain the ERISA plan that was in place from August 19 to August 31, 1998. Westinghouse — not Siemens — determined a plan participant's eligibility for benefits arising under the Westinghouse Plan from August 19 to August 31, 1998, and Westinghouse calculated the quantum of those benefits and disbursed the funds due to the

32

participants in that period. Further, Westinghouse funded the plan during that time and engaged in the extensive financial monitoring and record-keeping that the plan required.

In contrast, during the thirteen-day period Siemens had only the contingent, discrete obligation to reimburse Westinghouse Plan in the event Siemens terminated a legacy employee without cause prior to September 1, 1998, and the terminated employees, if any, were merely a subset of the entirety of the legacy employees. That contingent financial burden — which notably Siemens never incurred as it did not terminate any legacy employee prior to September 1 — was "predicated on the occurrence of a single contingency that may never [and in this case did not] materialize." See Fort Halifax, 468 U.S. at 12, 107 S.Ct. at 2218. Siemens' contingent obligation to reimburse Westinghouse after the fact did not require Siemens to make any administrative determination, see id., much less require it to analyze the legacy employees' particular circumstances and eligibility for benefits. While contingent or one-time pension or benefit obligations that require an administrative undertaking for their effectuation may, in some circumstances, constitute an ERISA plan, see Pane v. RCA Corp., 868 F.2d 631, 633-35 (3d Cir. 1989), in this case Siemens' contingent, one-time obligation to reimburse Westinghouse did not.

Although we are unaware of any earlier case in which we have considered an arrangement quite like the one here, in which after a successor employer employed legacy employees the original employer continued to offer for a brief period the legacy employees benefit credit for service and compensation,

33

we find additional guidance from our decision in Angst. In that case, we considered whether a company's offer of a one-time, lump-sum $75,000 severance payment and a one-year extension of benefits under its pension plan pursuant to a "buyout plan" aimed at encouraging senior employees to leave their employment voluntarily constituted an ERISA plan. 969 F.2d at 1532-33. We concluded that in light of Fort Halifax the $75,000 payment was not an ERISA plan because the arrangement "would require no ongoing administrative scheme." Id. at 1538. We further determined that because the one-year extension of benefits was administered pursuant to a benefits plan that was already in existence and the extension "did not require the creation of a new administrative scheme, and did not materially alter an existing administrative scheme," that facet of the buyout plan similarly did not implicate ERISA. Id. at 1539. As in Angst, here the extension of the already-extant Westinghouse Plan for thirteen days did not require Siemens to create a separate, new administrative scheme. Nor did that extension alter the Westinghouse Plan's existing administrative scheme; it merely added a contingent step subsequent to the operation of the plan.

Although we conclude that Siemens did not establish an ERISA "transition" plan by virtue of the thirteen-day arrangement from August 19 to August 31, 1998, because that arrangement did not require Siemens to perform the administrative undertaking that is the hallmark of an ERISA plan, we note that the short duration of the arrangement likewise counsels against finding that, if there had been any plan, it was Siemens that established the plan. We have made clear that "[t]he crucial factor in determining whether a 'plan' has been

34

established is whether [the employer has expressed an intention] to provide benefits on a regular and long-term basis.'" Deibler, 973 F.2d at 209 (quoting Wickman v. Northwestern Nat'l Ins. Co., 908 F.2d 1077, 1083 (1st Cir. 1990)). Consistent with this pronouncement, the relevant Treasury regulations provide:

> The term 'plan' implies a permanent as distinguished from a temporary program. Thus . . . the abandonment of the plan for any reason other than business necessity within a few years after it has taken effect will be evidence that the plan from its inception was not a bona fide program for the exclusive benefit of employees in general.

26 C.F.R. § 1.401-1(b)(2) (emphasis added); see also 26 C.F.R. § 1.401-1(b)(1)(i) ("A pension plan within the meaning of section 401(a) is a plan established and maintained by an employer primarily to provide systematically for the payment of definitely determinable benefits to his employees over a period of years, usually for life, after retirement."). Although we cannot draw a bright temporal line dividing ERISA plans from short-term, discrete benefit arrangements that do not implicate ERISA, we are confident that the thirteen-day arrangement here is of the latter type.

We note finally on the "transition" plan issue that Siemens' status as the legacy employees' actual employer during the thirteen-day window does not preclude us from concluding that Westinghouse maintained an ERISA plan for those persons during that time. ERISA defines an employee pension benefit plan as one "established or maintained by an employer or by an

35

employee organization, or by both." 29 U.S.C. § 1002(2)(A). Under ERISA, however, "[t]he term 'employer' means any person acting directly as an employer, or indirectly in the interest of an employer, in relation to an employee benefit plan." 29 U.S.C. § 1002(5) (emphasis added). ERISA thus recognizes that entities other than the participant's employer may establish or maintain an ERISA plan. See also Curtiss-Wright Corp. v. Schoonejongen, 514 U.S. 73, 78, 115 S.Ct. 1223, 1228 (1995) ("Employers or other plan sponsors are generally free under ERISA, for any reason at any time, to adopt, modify, or terminate welfare plans.") (emphasis added). Here, Westinghouse acted "indirectly in the interest of an employer [i.e., Siemens], in relation to an employee benefit plan" for the thirteen-day period. 29 U.S.C. § 1002(5). The circumstance that the beneficiaries of the Westinghouse Plan during that time period included persons whom Siemens then employed does not thereby make Siemens a co-sponsor of the plan when in reality Siemens neither funded nor administered the plan.

In short, although there was an ERISA plan in place for legacy employees from August 19 to August 31, 1998, that plan was the Westinghouse Plan, which Westinghouse sponsored, funded, operated and administered. We thus conclude that Siemens did not establish an ERISA "transition" plan. Consequently, Siemens did not provide PJS benefits to its employees during that time, and its later adoption of the Siemens Plans, which lacked PJS benefits, could not constitute an "amendment" of a "transition" plan in violation of section 204(g), as Siemens had not established any plan to amend. Therefore, we reject the Magistrate Judge's first theory supporting Siemens' liability because she founded that theory on

36

the incorrect conclusion that Siemens created an ERISA "transition" plan containing PJS benefits for the period from August 19 to August 31, 1998.

## B. A TRANSFER OF LIABILITIES UNDER SECTION 208

We now turn to the Magistrate Judge's second theory supporting her belief that Siemens would be liable in the absence of the releases. She predicated this conclusion on her belief that Westinghouse through the APA transferred a portion of the Westinghouse Plan's liabilities to the Siemens Plans and thus we now turn our attention to section 208. In considering this second theory we first address the applicability of section 208, which applies where a plan "merge[s] or consolidate[s] with, or transfer[s] its assets or liabilities to" another plan. 29 U.S.C. § 1058. Though appellees concede that the APA did not provide for a plan consolidation, merger, or a transfer of plan assets, they contend that section 208 applies because the APA provided for the Westinghouse Plan to transfer liabilities to the Siemens Plans. The District Court accepted this argument.

Section 208 does not set forth explicitly the circumstances in which there is a transfer of liabilities, nor do ERISA's other provisions provide a definition of the term. We are not, however, without guidance on this point as the corresponding Treasury Regulation states:

> A 'transfer of assets or liabilities' occurs when there is a diminution of assets or liabilities with respect to one plan and the acquisition of these assets or the assumption of these liabilities by

37

another plan.  For example, the shifting of assets or liabilities pursuant to a reciprocity agreement between two plans in which one plan assumes liabilities of another plan is a transfer of assets or liabilities.

26 C.F.R. § 1.414(l)-1(b)(3).  To determine whether there has been a transfer of plan liabilities within this definition in this case, we turn to the APA.

## 1.  RELEVANT PROVISIONS OF THE APA

At its broadest, the APA provided in paragraph 5.5(a)(ii) that

> Notwithstanding the more specific provisions set forth in this Section 5.5, [Siemens] shall provide compensation and benefit plans and arrangements <u>which in the aggregate are comparable</u> . . . to the compensation, Plans and Benefit Arrangements in effect for [the legacy employees] on [September 1, 1998] for a period of not less than two years following [September 1, 1998].

J.A.  137  (emphasis  added).[15]    Paragraph  5.5(d)(i)

---

[15]Siemens points out that in a certification required by the APA it was stated that Siemens' benefits were "in the aggregate comparable" to those provided by Westinghouse.  Appellants' br. at 11.  That fact, however, is not material to our disposition

provided in more precise terms that Siemens

> shall establish a defined benefit pension plan intended to qualify under Section 401(a) of the Code for the benefit of [the legacy employees] (the 'Purchaser Pension Plan') that contains terms and conditions <u>that are substantially identical with respect to all substantive provisions</u> to those of the Westinghouse Pension Plan <u>as in effect as of [September 1, 1998]</u> . . . and that credits compensation . . . and service for purposes of eligibility (including early retirement eligibility and any early retirement supplemental benefit), and vesting which was credited under the [Westinghouse] Pension Plan, provided, however, that the [Siemens] Pension Plan will include provisions which are consistent with (ii) through (iv) below and will be administered . . . so that the aggregate of the benefits under the [Westinghouse] Pension Plan and the [Siemens] Pension Plan are the same with respect to [the legacy employees] as if the . . . [e]mployees continued employment with [Westinghouse or one of its sold subsidiaries].

<u>Id.</u> at 138 (emphasis omitted and added).[16]

---

of this case.

[16]Notably, there is some discord between the requirement in paragraph 5.5(a)(ii) that Siemens provide benefits "which in the

The Magistrate Judge found that "the contractual obligation to provide substantially identical benefits to the transferring employees can be construed to be a transfer of [p]lan liability." Shaver, 2007 WL 1006682, at *19. While paragraph 5.5(d)(i) may suggest that the parties intended to impose liabilities on Siemens, Siemens' contractual promise to provide substantially identical benefits surely does not constitute an assumption of Westinghouse Plan's liabilities, as an agreement to provide benefits is discrete from an agreement to assume another employer's obligation to provide benefits. Indeed, as we have noted already, after September 1, 1998, the Westinghouse Plan remained in existence and continued to provide legacy employees with benefits that they accrued prior to that date. We therefore consider the more specific provisions of the APA, which require close examination.

---

aggregate are comparable" to the benefits of the Westinghouse Plan and the requirement in paragraph 5.5(d)(i) that Siemens provide "substantially identical benefits" to the legacy employees as it would seem to be obvious that benefits could be "comparable" without being "substantially identical." While not a critical matter in light of the more detailed provisions of the APA, we believe that to the extent that the requirements are inconsistent the former takes precedence over the latter because paragraph 5.5(a)(ii) states that Siemens shall provide "comparable" benefits "[n]otwithstanding the more specific provisions set forth in . . . Section 5.5." See Black's Law Dictionary 1168 (9th ed. 2009) (defining "notwithstanding" as "[d]espite; in spite of").

Section 2.3 of the APA provides, in relevant part:

(a) <u>Assumed Liabilities</u>. Upon the terms and subject to the conditions of this Agreement . . . , [Siemens] hereby agrees to assume, effective as of [September 1, 1998], and agrees to pay, perform and discharge when due all of the following Liabilities of [Westinghouse] (except Excluded Liabilities) arising out of, relating to or otherwise in respect of the Acquired Assets, the Business or the operations of the Business before, on or after [September 1, 1998] (collectively, the '<u>Assumed Liabilities</u>'):

. . .

(vii) <u>all liabilities arising under or in connection with any Plan or Benefit Arrangement</u>;

. . .

(b) <u>Excluded Liabilities.</u> Any provision of this Agreement to the contrary notwithstanding . . . , the following liabilities (the '<u>Excluded Liabilities</u>') of [Westinghouse] and [its] Sold Subsidiaries are excluded and shall not be assumed or discharged by [Siemens]:

. . .

(x) any Liabilities with respect to Plans and Benefit Arrangements retained by [Westinghouse] under Section 5.5; and

(xi) any other Liabilities not assumed by [Siemens] pursuant to the provisions of Section 2.3(a).

J.A. 133-35 (some emphasis added).

Under paragraph 2.3(a)(viii), Siemens assumed "[a]ll [l]iabilities arising under or in connection with any Plan or Benefit Arrangement." The APA defines "Plan" as:

> any plan, program, agreement or arrangement, whether or not written, that is or was an 'employee benefit plan' as such term is defined in Section 3(3) of ERISA, whether or not subject to ERISA and whether or not maintained in the U.S., and (a) which is maintained by [Westinghouse] or [its] Sold Subsidiaries, (b) to which [Westinghouse] or [its] Sold Subsidiaries contribute or fund or provide benefits; or (c) which provides or promises benefits to any person who performs or who has performed services for [Westinghouse] or [its] Sold Subsidiaries and because of those services is or has been (i) a participant therein or (ii) entitled to benefits thereunder.

Id. 127. The Westinghouse Plan is a "plan" within the meaning of paragraph 2.3(a)(viii). Accordingly, Siemens assumed all of Westinghouse Plan's liabilities except those which Westinghouse retained under section 5.5.

In relevant part, section 5.5 provided that the "[Westinghouse] Pension Plan shall retain liability with respect to [the legacy employees] for their accrued benefit calculated as

42

of [September 1, 1998], subject to [certain adjustments]." Id. 138-39. Paragraph 5.5(d)(iv), however, qualifies Westinghouse's retention of accrued-benefit liability by stating:

> [Siemens] Pension Plan shall be solely responsible for (and the [Westinghouse] Pension Plan shall not provide for) (A) any early retirement supplement that becomes payable with respect to a [legacy employee] retiring after [September 1, 1998] that is the result of a 'Pension Event' as defined in subsection (v)[17] . . . , (B) any benefits pursuant to Section 19 [the PJS provision] of the [Westinghouse] Pension Plan and the corresponding provision of the [Siemens] Pension Plan, in excess of the benefits that would otherwise be payable if those sections

---

[17]Paragraph 5.5(d)(v) in turn defined a "Pension Event" as encompassing "(A) a Disposition, (B) a closing of a plant or plants by [Siemens] or a reduction in the number of [legacy employees] employed by [Siemens] and its Affiliates as a result of action requiring the filing of a notice under the Worker Adjustment and Retraining Notification Act . . . , or (C) any action of [Siemens] or its Affiliates that provides an incentive to [legacy employees] to terminate or retire prior to their Normal Retirement Date." J.A. 140. Relatedly, paragraph 5.5(d)(v) stated that Siemens "shall indemnify [Westinghouse] for any actuarial losses . . . with respect to the [Westinghouse] Pension Plan resulting from [any early retirements triggered by the enumerated Pension Events]." Id.

43

did not apply, with respect to a [legacy employee] who retires or terminates employment with [Siemens] and its Affiliates after [September 1, 1998], and (C) any other early retirement subsidy or supplement with respect to [legacy employees] that is not described in [Section 5 of the Westinghouse Pension Plan].

Id. 139-40. The additional provisions of section 5.5 added by amendment to the APA delineate further Siemens' and Westinghouse's respective scopes of liability from August 19 to August 31, 1998; however, they do not alter the pre-existing provisions of section 5.5 recited above.

Taken together, paragraphs 2.3(a)(viii), 5.5(d)(iii), and 5.5(d)(iv) demonstrate that Siemens assumed a portion of Westinghouse Plan's pension obligations. Specifically, after adoption of the APA, Siemens was and is liable for the early retirement supplements that come due because of a "Pension Event," for any PJS benefits payable under the Westinghouse Plan with respect to a legacy employee who retires after September 1, 1998,[18] and any other early retirement subsidy or

---

[18]Of course, the liability for PJS benefits was dependent on such benefits being due, and as we explain later the APA did not impose liability for PJS benefits for job separations after August 31, 1998. Plainly, in the complex APA Westinghouse was covering itself on this point as paragraph 5.5(d)(iv) made Siemens liable only for "any" PJS benefits after September 1, 1998, language that readily accommodates a situation in which there are no such benefits. Moreover, the sunset provision that

supplement besides that provided for in section 5 of the Westinghouse Plan.[19]  In this regard, the Westinghouse Plan's liabilities have been diminished, thus triggering the applicability of section 208.

Siemens presents an array of arguments that it contends precludes a finding that the APA provided for the Westinghouse Plan to transfer liabilities to the Siemens Plans in accordance with section 208.  It contends that because paragraph 5.5(d)(iv) "addressed only a tiny subset of retirement benefits offered by Westinghouse — those providing special early retirement for certain employees who retired prior to age 62 — that are not claimed by [appellees] here and are not at issue in this case," any liabilities transferred for those benefits are irrelevant. Appellants' br. at 47.  In a somewhat contradictory argument, Siemens contends that even if Westinghouse transferred some obligations to Siemens, "the contingent and inchoate responsibility for PJS benefits and early retirement supplements . . . [are] not 'liabilities' within the meaning of [s]ection 208."

---

was in existence when the APA was executed, though as we will explain we later invalidated, made it clear that there could not be PJS benefits for job terminations after September 1, 1998.

[19]One example of such an early retirement supplement for which Westinghouse is apparently no longer responsible lies in section 20 of the Westinghouse Plan, which provides for a "Special Early Retirement Supplement," based on age and years of service, to be paid as a monthly pension until the employee reaches sixty-two years of age.  J.A. 351.

Id. at 50. Finally, Siemens contends that the APA could not have provided for a transfer to Siemens of a portion of Westinghouse Plan's liabilities because a transfer of liabilities without a transfer of equivalent assets "would leave both plans out of compliance with statutory and regulatory requirements."[20] Id. at 41. These contentions are unconvincing.

Though the events here differ from the ordinary scenario that triggers the applicability of section 208, we can find nothing within section 208 or the applicable Treasury regulations indicating that only a transfer of all of a plan's assets or liabilities will activate that provision. Indeed, 26 C.F.R. § 1.414(l)-1(b)(3) defines a transfer of liabilities as "a diminution of . . . liabilities," not a total elimination of liabilities. See Black's Law Dictionary 524 (9th ed. 2009) (Diminution means "[t]he act or process of decreasing, lessening, or taking away."). Furthermore, as shown above, Siemens assumed liability for any PJS benefits that became payable under the Westinghouse Plan for an employee who was terminated after September 1, 1998.[21]

---

[20]This argument is remarkable because it seems to be predicated on the principle that parties could not do anything illegal because to do so would be illegal. Oh that this would be so. On the other hand, though unlikely, it might mean that in a case of ambiguity the scope of a party's undertakings should be measured in such a way that they are lawful.

[21]As we explain below, Siemens' assumption of this liability was effectively hollow, as an employee who Siemens terminated would not be eligible for PJS benefits under the Westinghouse

46

Siemens' contention that responsibility for PJS benefits and other early retirement benefits do not constitute liabilities within the meaning of section 208 is likewise unavailing. As we have indicated, section 208 does not define liabilities. In the Senate Report to the 1984 amendments, however, Congress made clear its view that contingent or otherwise putative obligations constitute "liabilities" on a plan termination basis under ERISA. See S. Rep. No. 98-575, at 31, 1984 U.S.C.C.A.N. at 2577 ("[A] plan is not to be considered to have satisfied all of its liabilities to participants and beneficiaries until it has provided for the payment of contingent liabilities with respect to a participant who, after the date of the termination of a plan, meets the requirements for a subsidized benefit.") (emphasis added); see also Gillis, 4 F.3d at 1147 (treating liability for early retirement benefits as "liabilities" under section 208).

Finally on this point, we note that section 208 applies when a pension plan "transfer[s] its assets or liabilities" to another plan, 29 U.S.C. § 1058 (emphasis added), and thus plainly does not require a transfer of assets to trigger its provisions. The question of whether Westinghouse's transfer of liabilities without a concomitant transfer of assets rendered the Westinghouse Plan and Siemens Plans non-compliant under ERISA is not the issue before us on appeal.

Inasmuch as we have concluded that Westinghouse

Plan. Nevertheless, Siemens could seek to cover itself on this point.

47

transferred liabilities to the Siemens Plans within the meaning of section 208, we turn to the distinct question of what effect, if any, that transfer had on Siemens' obligation, vel non, to provide PJS benefits.  As noted, the Magistrate Judge appeared to conclude that, without regard for section 204(g), because Westinghouse transferred liabilities to Siemens, section 208 required that the Siemens Plans "provide equal or greater benefits," including PJS benefits, to the benefits of the Westinghouse Plan.  See Shaver, 2007 WL 1006681, at *27.  The Magistrate Judge also determined that section 208 triggered section 204(g), which required Siemens to offer PJS benefits.  We review each of these conclusions in turn.

## 2.  THE REQUIREMENTS OF SECTION 208

As we described above, section 208 guarantees that if a pension plan consolidates with another plan or transfers its assets or liabilities to another plan, the benefits to which plan participants are entitled will not be reduced and the actual value of those benefits will not be diminished.  See Bigger v. Am. Commercial Lines, 862 F.2d 1341, 1344 (8th Cir. 1988) (Section 208 "establishes a 'rule of benefit equivalence.'  The value of the benefit before and after the [transaction triggering section 208] must be equal.") (citing 26 C.F.R. § 1.414(l)-1(n)).  In the House Report to section 208, Congress explained the effect of section 208 and the hypothetical termination analysis it requires:

> Under the bill as passed by the House, a plan must provide protection to participants in the case of a merger of the plan with another plan or the

48

transfer of assets or liabilities from a plan. The value of benefits to the participant and the extent to which the benefits have been funded is to be protected by comparing what the participant's benefit would be if the plan had terminated immediately before the merger and what the participant's benefits would be under the merged plan had the merged plan been terminated just after the merger. The postmerger termination benefit may not be less than the premerger termination benefit.

H.R. Rep. No. 93-1280, at 385 (1974) (Conf. Rep.), reprinted in 1974 U.S.C.C.A.N. 5038, 5163.

Most often, section 208 is implicated in cases of plan mergers or so-called "spinoff" plans, in which one plan splits into two or more plans, see 26 C.F.R. § 1.414(l)-1(b)(4). See, e.g., Bigger, 862 F.2d at 1344 (Section 208 "provides a specific standard that employers can rely upon in allocating assets to spunoff plans."). In these circumstances, "[s]ection 208 essentially requires the employer to contemplate a hypothetical plan termination, take a 'snapshot' of the benefits each participant of the plan would receive in the event of a termination, and then provide the aggregate present value of these benefits to the spun-off plan." Systems Council EM-3 v. AT&T Corp., 159 F.3d 1376, 1380 (D.C. Cir. 1998).

There is, however, no basis to hold that the APA contemplated the creation of a spinoff plan. The Westinghouse Plan retained liability for the majority of the legacy employees'

49

accrued benefits, and Siemens is not responsible for those benefits. The Treasury regulation counterpart to section 208 provides, however, that "[a]ny transfer of assets or liabilities will for purposes of section 414(l) be considered as a combination of separate mergers and spinoffs . . . ." 26 C.F.R. § 1.414(l)-1(o). "First, the transfer is treated as a spin-off of a new plan . . . [and] [a]ssets are therefore to be allocated to participants' benefits on a termination basis." Stephen R. Bruce, Pension Claims: Rights and Obligations 511 (2d ed. 1993). "Second, the transfer of these assets and the associated benefit liabilities to the second plan is treated as a merger of the spun-off plan and the second plan." Id. Thus, as in the case of a plan spinoff or merger, to ascertain whether and to what extent Siemens was obligated to provide appellees PJS benefits we necessarily must determine the extent to which the legacy employees would have been entitled to those benefits upon a hypothetical termination of the Westinghouse Plan prior to Westinghouse's transfer of its liability for those benefits. Cf. Brillinger v. Gen. Elec. Co., 130 F.3d 61, 63 (2d Cir. 1997) ("[S]ection [208] deals with the level of post-merger benefits, and in dealing with this issue resort must be had to those parts of the termination provisions which deal with the analogous subject — i.e. the level of benefits following termination."). As we explained previously, that determination necessarily entails reference to section 204(g), which protects accrued benefits, including early retirement benefits and retirement-type subsidies, in the event of a plan amendment or a plan termination.

This is all to say that section 208 is more nuanced than the Magistrate Judge recognized. The section does not, as the

50

Magistrate Judge determined, impose a blanket requirement that Siemens adopt verbatim the Westinghouse Plan (or a more generous pension plan). Rather, it protects appellees' accrued benefits with those benefits determined as of a hypothetical termination of the Westinghouse Plan just prior to the transfer of liabilities.[22] Whatever else may be said about this case, the determination of those benefits so far as the Westinghouse Plan by its terms provided for them is not complicated.

### 3. THE LEGACY EMPLOYEES' ENTITLEMENT ON

---

[22] Reference to the corresponding Treasury regulation governing section 208 transactions bears the point out. That regulation provides that in the case of a plan spinoff,

> the requirements of section 414($l$) will be satisfied if (i) [a]ll of the accrued benefits of each participant are allocated to only one of the spun off plans, and (ii) [t]he value of the assets allocated to each of the spun off plans is not less than the sum of the present value of the benefits on a termination basis in the plan before the spinoff for all participants in that spun off plan.

26 C.F.R. § 1.414($l$)-1(n)(1). In the case of a merger of two ERISA plans, "[i]f the sum of the assets of all plans is not less than the sum of the present values of the accrued benefit (whether or not vested) of all plans, the requirements of section 414($l$) will be satisfied by merely combining the assets and preserving each participant's accrued benefits." 26 C.F.R. § 1.414($l$)-1(e)(1).

A TERMINATION BASIS

At this stage of our opinion and before we turn to the required hypothetical termination analysis we have described above, we address our description of PJS benefits in Bellas for it is obvious that our characterization of the benefits in that case clouded the disposition of this case in the District Court. For the purposes of section 204(g), early retirement benefits and retirement-type subsidies are considered accrued benefits and therefore section 204(g) protects them from cutback. See 29 U.S.C. § 1054(g). Section 204(g)(2) states, however, that "[i]n the case of a retirement-type subsidy, [section 204(g)(1)'s protection] shall apply only with respect to a participant who satisfies (either before or after the amendment) the preamendment conditions for the subsidy." 29 U.S.C. § 1054(g)(2). Section 204(g) does not provide that same explicit qualifier on the protection of early retirement benefits. As noted, in Bellas we conceptually bifurcated the PJS benefits, holding that the portion of the Westinghouse PJS benefits that is "equal to the actuarially reduced normal retirement benefit" is an early retirement benefit, while any benefits paid in excess of the actuarially reduced value constitutes a retirement-type subsidy. 221 F.3d at 538. We further concluded that PJS benefits are accrued upon their creation — not upon the happening of the contingent event (i.e., the job separation) — and that section 204(g) accordingly protects those benefits from cutback. Id. at 532. Relying on Bellas's division of PJS benefits into an early retirement subsidy and a retirement-type subsidy and section 204(g)(2)'s provision regarding satisfaction of preamendment conditions as to retirement-type subsidies, the Magistrate Judge determined that appellees were required to

52

establish that they would have been eligible for the PJS benefits under the terms of the Westinghouse Plan upon a hypothetical termination of that plan as to the portion of those benefits constituting a retirement-type subsidy but they were not required to do so as to that portion constituting an early retirement benefit.  See Shaver, 2007 WL 100681, at *20.  But the Magistrate Judge predicated her approach on a misreading of section 204(g).

We recognize that, regrettably, section 204(g)(2) is ambiguous, and in isolation its explicit statement that section 204(g) protects retirement-type subsidies from cutback for a participant who satisfies, preamendment or postamendment, the preamendment conditions placed upon the subsidy could be read to mean that that qualifier does not apply to early retirement benefits, particularly in view of the circumstance that section 204(g)(2)(A) addresses both "an early retirement benefit or a retirement-type subsidy."  Thus, it might be thought that section 204(g) protects from cutback a participant's early retirement benefit even if the participant does not at the time of plan amendment (or in this case plan termination) and cannot in the future satisfy the conditions for that benefit.  We have made clear, however, that "the [Retirement Equity Act of 1984] does not override the conditions originally imposed by the [p]lan which defined the early retirement benefits when they were created."  Dade, 68 F.3d at 1562.  Describing the import of section 204(g), we explained that "the fact that [amendments eliminating or reducing early retirement benefits or retirement-type subsidies] will now be 'treated as reducing accrued benefits' does not mean that Congress intends to foreclose employers from circumscribing the availability of such optional

53

benefits when they are being created." Ashenbaugh v. Crucible Inc., 854 F.2d 1516, 1527 (3d Cir. 1988).

As is evident from our foregoing explanation, especially our case law, "ERISA [section] 204(g) can protect an entitlement to benefits, but it cannot create an entitlement to benefits when no entitlement exists under the terms of the [p]lan." Hein v. FDIC, 88 F.3d 210, 217 (3d Cir. 1996) (emphasis added). Indeed, notwithstanding our conceptual division of PJS benefits in Bellas, in that case we assumed that section 204(g) protects early retirement benefits, along with retirement-type subsidies, only to the extent a plan participant satisfied or could satisfy the preamendment conditions placed upon the early retirement benefit. We stated:

> After 1984, a plan sponsor could eliminate prospectively an early retirement benefit by amendment, but under section 204(g) the amendment could not adversely affect that portion of an early retirement benefit that already had accrued to a plan participant who satisfied the pre-amendment conditions for the benefit either before or after the amendment. See 29 U.S.C. § 1054(g); Dade, 68 F.3d at 1562. Thus, if the 1994 Westinghouse Plan amendments reduced or eliminated early retirement benefits or retirement-type subsidies, the amendments would have had to allow employees who remained employed by CBS after the amendments to 'grow into' the benefit. See id. at 1562.

54

221 F.3d at 524 (emphasis added); see also Bruce, Pension Claims 185 ("When an early retirement benefit, a retirement-type subsidy, or a benefit option is protected against reduction or elimination, the protection is for the benefits that would be provided under the benefit option based on the accrued benefits up to the date of change, assuming that the participant has met or later meets any special eligibility (or vesting) requirement for the benefit.") (emphasis partially omitted and partially added).

The legislative history to section 204(g) is consistent with our precedent and reveals Congress' intent that section 204(g) protect only those benefits — whether classified as early retirement benefits or retirement-type subsidies — for which a participant meets the plan requirements. The Senate Report states, in relevant part:

> The bill generally protects the accrual of benefits with respect to participants who have met the requirements for a benefit as of the time a plan is amended and participants who subsequently meet the preamendment requirements. The bill does not, however, prevent the reduction of a subsidy in the case of a participant who, at the time of separation from service (whether before or after the plan amendment), has not met the preamendment requirements.
> . . .
> Accordingly, the bill makes it clear that the prohibition against reduction of a benefit subsidy (the excess of the value of a benefit over the actuarial equivalent of the normal retirement

55

benefit) applies to a participant only if the participant meets the conditions imposed by the plan on the availability of the subsidy. If the protection is afforded, an employee's accrued benefit is not to be less than the protected level or the accrued benefit determined under the plan without regard to the protection, whichever is greater. For example, if a plan is amended to eliminate a subsidized early retirement benefit for employees who have completed 30 years of service, then the plan would not be required to provide the subsidy to an employee who never completes 30 years of service <u>and it would not be required to provide benefits to such an employee before the normal retirement age.</u>

S. Rep. No. 98-575, at 28, 1984 U.S.C.C.A.N. at 2574 (emphasis added). The provision of benefits to an employee "before the normal retirement age" apart from the "subsidy" is, of course, an early retirement benefit as we defined that term in <u>Bellas</u>. <u>See</u> 221 F.3d at 538 ("[The] portion paid that is equal to the actuarially reduced normal retirement benefit[] constitutes an early retirement benefit."). It is thus apparent that despite section 204(g)'s focus on satisfaction of preamendment conditions for retirement-type subsidies, Congress assumed in passing section 204(g) that the provision only would protect early retirement benefits to the extent that an employee satisfied or can satisfy the plan conditions for the benefit.

If there was any question as to the proper interpretation of section 204(g), the Treasury regulation implementing the

Internal Revenue Code counterpart to section 204(g), 26 U.S.C. § 411, surely answers that question. As noted, Treasury regulations implementing the Internal Revenue Code version of the anti-cutback rule apply with equal force to section 204(g). See 29 U.S.C. § 1202(c). The implementing regulation to section 411 provides:

> Except as provided in this section, a plan is treated as decreasing an accrued benefit if it is amended to eliminate or reduce a section 411(d)(6)(B) benefit as defined in paragraph (g)(15) of this section. This paragraph (b)(1) applies to participants who satisfy (either before or after the plan amendment) the preamendment conditions for a section 411(d)(6)(B) protected benefit.

26 C.F.R. § 1.411(d)-3(b)(1)(i) (emphasis added). In turn, a section 411(d)(6)(B) protected benefit is defined as "the portion of an early retirement benefit, retirement-type subsidy, or an optional form of benefit attributable to benefits accrued before the applicable amendment date." 26 C.F.R. § 1.411(d)-3(g)(15) (emphasis added). Accordingly, an early retirement benefit is considered accrued for purposes of section 411, and thus for purposes of section 204(g), only where the plan participant at some point satisfies the preamendment conditions for the benefit.

In sum, we find that section 204(g) does not protect from cutback an early retirement benefit for a plan participant who has not satisfied and never can satisfy the conditions for

57

receiving the benefits that are subject to the cutback. Indeed, were we to conclude otherwise our opinion would have the bizarre result that it would treat section 204(g) as protecting the benefits of a plan participant from cutback in circumstances in which the participant never will be eligible for those benefits. Thus, our opinion would extend section 204(g)'s protection on paper only to a set of phantom benefits which never actually will vest for the participant, or, result, directly contrary to our opinions in Ashenbaugh, Dade, and Hein, in going further in creating an entitlement under section 204(g) where none otherwise would exist under the terms of the plan. The first result is unreasonable and the second is contrary to well-established ERISA principles. See Spink, 517 U.S. at 887, 116 S.Ct. at 1788 (ERISA guarantees that "if a worker has been promised a defined pension benefit upon retirement — and if he has fulfilled whatever conditions are required to obtain a vested benefit — he will actually receive it.") (emphasis added) (internal quotation marks and citation omitted); Firestone Tire and Rubber Co. v. Bruch, 489 U.S. 101, 113, 109 S.Ct. 948, 956 (1989) (ERISA was enacted "to protect contractually defined benefits.") (internal quotation marks and citation omitted) (emphasis added).

(a) Appellees did not and could not satisfy the conditions for PJS benefits.

Inasmuch as we have determined that we must analyze appellees' entitlement to PJS benefits upon the basis of a hypothetical termination of the plans as to the entire portion of PJS benefits, we finally turn to the crux of this segment of our opinion and consider whether appellees would have been

58

entitled to PJS benefits upon a hypothetical termination of the Westinghouse Plan just prior to the transfer of liabilities. In relevant part, the Westinghouse Plan provides that:

> For periods on or after January 1, 1997 and before September 1, 1998, a Permanent Job Separation means solely the termination of the employment of an Employee with an Employer, Affiliated Entity, or Excluded Unit because of job movement or product line relocation, or location closedown, as those terms are defined below.

J.A. 292. The Plan defines "Employer, Affiliated Entity, or Excluded Unit" as Westinghouse or any Westinghouse subsidiary or joint venture participating in the Westinghouse Plan. Id. 284, 288, 292. The Plan, however, contains the additional express limitation that "in no event shall a Permanent Job Separation occur if an Employee is offered continued employment by . . . a successor employer." Id. 293.

If the Westinghouse Plan had been terminated just prior to transferring a portion of its liabilities under the APA on September 1, 1998, appellees plainly would not have been eligible for PJS benefits. As of that date, appellees were Westinghouse employees who were "offered continued employment by . . . a successor employer," namely, Siemens. Nevertheless, as noted previously, under section 204(g) a plan participant need not satisfy at the time of a plan's termination the conditions placed on an early retirement benefit or retirement-type subsidy. If following the transfer of liabilities appellees potentially could have been eligible for the

59

Westinghouse Plan's PJS benefits in the future, section 204(g) would have protected those benefits, and appellees' benefits upon a hypothetical termination of the Westinghouse Plan prior to the transfer of liabilities thus would have included PJS benefits. Accordingly, section 208 would have protected appellees' PJS benefits from elimination or reduction by virtue of the Siemens-Westinghouse transaction. Here, however, the bar to entitlement that would have existed in a pretransfer situation remains. Appellees did not after the transfer of liabilities become eligible nor will they ever be eligible for PJS benefits under the Westinghouse Plan for the same reason they were not eligible for those benefits just prior to Westinghouse's transfer of liabilities — they were offered continued employment by Siemens. Accordingly, section 204(g) did not protect appellees' PJS benefits from cutback and thus appellees' benefits upon a hypothetical termination of the Westinghouse Plan just prior to the transfer of liabilities would not have included PJS benefits.

Notwithstanding this seemingly insurmountable obstacle to appellees' claim, the Magistrate Judge concluded that the successor-employer limitation on PJS benefits was not fatal to appellees' claim, as she stated that "Gillis held that satisfaction of pre-amendment conditions does not have to occur until separation from service [and] as in Gillis, no separation from service occurred until Siemens terminated the transferred employees." Shaver, 2007 WL 1006681, at *28. The Magistrate Judge did not, however, proceed to analyze whether appellees would have satisfied the conditions for PJS benefits upon Siemens' termination of appellees. Rather, she concluded that "the APA extends the PJS benefits by contractual

60

agreement," such that the prohibitive language in the Westinghouse Plan did not bar appellees' claim. Id. These conclusions plainly were wrong.

In Gillis, Hoechst Corporation sold a division of its business and transferred all assets and liabilities of its ERISA plan attributable to that division to American Mirrex. 4 F.3d at 1140. There was, in other words, a plan spinoff. The American Mirrex Plan provided that employees of that division who transferred to American Mirrex were to "receive the same early retirement benefits subject to the same conditions as [the Hoechst Retirement Plan]." Id. at 1149 (Alito, J., concurring). Plaintiffs were transferred employees who, at the time of transfer, had not met the age and years-of-service requirements to qualify for early retirement benefits under the Hoechst Plan. Id. at 1143. Plaintiffs sued Hoechst and its pension plans, alleging that Hoechst's failure to transfer sufficient assets to American Mirrex to fund plaintiffs' early retirement benefits violated section 208. Id. They contended that notwithstanding their insufficient age and years-of-service at the time they transferred employment to American Mirrex they could qualify for the early retirement benefits provided under the Hoechst Plan through their subsequent service with American Mirrex, and that Hoechst's contrary interpretation of its plan amounted to an amendment of the plan in violation of section 204(g). Id. at 1144. Hoechst countered that it was not required to credit service with American Mirrex and because plaintiffs could not satisfy the conditions for receiving those benefits section 204(g) did not protect them from cutback. Id. at 1144.

Finding scant guidance in the text of section 204(g), we

61

turned to pertinent Internal Revenue Service Rulings to resolve the case. Id. at 1144-45. Based on a Revenue Ruling that concluded that under section 204(g) an employee could satisfy following a plan termination the plan's age and years-of-service pretermination conditions for early retirement benefits and that those benefits thus had to be funded before residual assets could revert to the employer, we determined that had Hoechst continued to employ the plaintiffs after terminating its plan the plaintiffs still would have been able to qualify for the early retirement benefits at some future date and Hoechst would have had to have allowed the employees to "grow into" those benefits. Id. at 1145-46. Relying on a further Revenue Ruling that determined that a "separation from service" does not occur upon an employee's transfer to a successor employer, we concluded that because the plaintiffs continued in the same job for a successor employer, they could continue to accumulate years of service under the Hoechst Plan through their subsequent employment with American Mirrex and potentially satisfy the age and years-of-service requirements for the early retirement benefit. Id. at 1144-47. Accordingly, we held that section 208 required that Hoechst transfer sufficient assets to American Mirrex to fund the early retirement benefits. Id. at 1147.

Gillis confirmed that satisfaction of benefit conditions can occur after a plan termination or amendment. It is equally clear from that case, however, that a plan participant nevertheless must, at some point, meet all of the conditions placed upon those benefits to receive them. Appellees contend that the Magistrate Judge correctly found their claims viable under Gillis notwithstanding the absence of any analysis of appellees' eligibility because under Gillis "transferred

62

employees may treat service for a successor employer as service for the plan sponsor for the purpose of qualifying for early retirement benefits." Appellees' br. at 9. But this statement is not correct for Gillis does not stand for the broad proposition that service with a successor employer may be treated as service for the plan sponsor to the end that all conditions the plan sponsor places upon retirement benefits are obviated.

We concluded in Gillis that employees who continue in the same job for a successor employer that has assumed the assets and liabilities of the original employer's plan may work towards satisfying the age and years-of-service requirements of the original employer's plan while working for the successor employer. 4 F.3d at 1147. But in Gillis, there was no bar to the plaintiffs' eligibility for the benefits under the Hoechst Plan other than their inadequate age and years of service at the time they ceased employment for Hoechst and plaintiffs could meet those requirements with the progression of time. Here, however, we do not have a plan spinoff, and age and years-of-service requirements are not the impediments to appellees' PJS benefits eligibility under the Westinghouse Plan. Rather, the "successor employer" provision of the Westinghouse Plan is an explicit bar to eligibility that, quite aside from the sunset provision in the Westinghouse Plan, forever disqualifies appellees from receiving PJS benefits under that plan and is a prohibition that the passage of time cannot cure. Notwithstanding the timing of appellees' "separation from service," appellees became ineligible for PJS benefits upon being offered continued employment by Siemens. Stated another way, appellees could not fulfill the conditions required to obtain the PJS benefits as one of those conditions was that a

63

successor employer not offer a plan participant continued employment and that is precisely what happened here. Accordingly, we are at a total loss as to how, as appellees urge that we do, we can circumvent this explicit condition of the Westinghouse Plan by somehow treating appellees' service with Siemens as uninterrupted service with Westinghouse and, directly contrary to the terms of the Westinghouse Plan, ignore appellees' employment by Siemens. We decline to engage in such judicial alchemy.

Though our result does not depend on this point, we note also that upon termination by Siemens appellees faced the additional bar to PJS eligibility that "solely" a termination by Westinghouse, a Westinghouse subsidiary, or a joint venture participating in the Westinghouse Plan allowed for PJS benefits under the Westinghouse Plan. J.A. 292. Siemens is not a Westinghouse subsidiary nor is it a joint venture participating in the Westinghouse Plan.

Once before, in Gritzer v. CBS, Inc., 275 F.3d 291, 293-94 (3d Cir. 2002), we considered whether termination by a successor employer entitles former Westinghouse employees to PJS benefits under the Westinghouse Plan. In that case, the plaintiffs were former Westinghouse employees who had transferred employment to Industrial Ceramics, Inc., ("Ceramics") upon Westinghouse's sale of a facility to Ceramics. Id. at 293. Section 14(f)(1) of the relevant Westinghouse Plan provided that the plan managers "may . . . and to the extent they consider advisable, treat service with [a successor company] as service with [Westinghouse] for purposes of [vesting and eligibility for pensions and benefits]."

64

Id. at 297. Pursuant to the sale, Ceramics and Westinghouse also executed a Reciprocal Service Agreement ("RSA") providing that Westinghouse would grant to transferred employees "service credit for their service with [Ceramics] for the purposes of pension eligibility under any applicable [Westinghouse] pension plan in which the employe[e]s may have been participating, but not for purposes of pension benefit accrual thereunder." Id. at 293. Ceramics later closed the facility, and the plaintiffs sued Westinghouse, by then, CBS for PJS benefits. Id. at 294.

We observed that the Westinghouse Plan requires that the "Employer" terminate an employee for purposes of PJS eligibility and that "'Employer' means simply Westinghouse." Id. at 297. We concluded that, "any other successor company . . . does not qualify as an 'Employer' under the express terms of the Plan," and that this fact was a "seemingly fatal flaw" in the plaintiffs' argument because a termination by Ceramics was plainly not a qualifying termination under the PJS benefits provision. Id. We then rejected the plaintiffs' contention that "Westinghouse, by extending some benefits under the Plan through its RSA with Ceramics, automatically or necessarily by virtue of [section] 14(F)(1) extended [PJS] benefits," id. at 298, and we thus held that the plaintiffs could not qualify for PJS benefits, id. at 298-99.

As was true with respect to a successor employer to Westinghouse in Gritzer, Siemens' termination of appellees was not a termination that triggered a possible claim for the PJS benefits provision under the Westinghouse Plan. This fact serves as an additional and independent bar to appellees'

65

eligibility under the Westinghouse Plan apart from the successor employer provision. It is important to recognize that appellees' ineligibility for PJS benefits is not rooted in the sunset provision of the Westinghouse Plan that we struck down in Bellas, and that congruently the invalidation of the sunset provision cannot possibly make the appellees eligible for PJS benefits from the Westinghouse Plan or thus eligible for benefits under the Siemens Plans. Rather, with or without the sunset provision, there simply is no escape from the conclusion that appellees could not satisfy the requisite conditions for receiving PJS benefits under the Westinghouse Plan. Moreover, appellees do not challenge the validity of these other requisite conditions.

Accordingly, because appellees could not satisfy at the time of a hypothetical termination of the Westinghouse Plan nor could they have satisfied at a later date the conditions for receiving PJS benefits under the Westinghouse Plan, section 204(g) did not protect those benefits upon a hypothetical termination of the Westinghouse Plan. Thus, appellees' benefits upon a hypothetical termination of the Westinghouse Plan just prior to the transfer of liabilities would not have included PJS benefits. Furthermore, upon a hypothetical termination of the Siemens Plans just following the transfer of liabilities, appellees' benefits also would not have included PJS benefits. Hence, appellees would have received no less upon a hypothetical termination of the Siemens' Plans following the transfer of liabilities than they would have received upon a hypothetical termination of the Westinghouse Plan just prior to the transfer of liabilities. Consequently, Siemens' omission of a provision for PJS benefits and appellees' consequent lack of entitlement to PJS benefits upon a hypothetical termination of

Siemens Plans just following the transfer of liabilities did not diminish appellees' benefits and neither section 208 nor section 204(g) required that Siemens provide appellees with PJS benefits.

(b) The APA did not contractually require Siemens to offer PJS benefits.

But the Magistrate Judge had more arrows in her quiver than sections 208 and 204(g) because she found alternatively that appellees were not required to meet the terms of the Westinghouse Plan because "the APA extends the PJS benefits by contractual agreement." Shaver, 2007 WL 1006681, at *28. In theory, such an agreement could have supported her recommendation. Appellees understandably rely heavily on this contractual theory as they contend that the APA provision requiring Siemens to adopt a pension plan for the legacy employees "that contains terms and conditions that are substantially identical with respect to all substantive provisions to those of the Westinghouse Pension Plan as in effect as of [September 1, 1998]," J.A. 138, contractually bound Siemens to provide PJS benefits to appellees apart from any specific ERISA provision. At oral argument in support of this contention appellees brought to our attention the Court of Appeals for the Fifth Circuit's recent decision in Evans v. Sterling Chemicals Inc., 660 F.3d 862 (5th Cir. 2011).

But before considering Evans and the rest of the details of appellees' argument that the APA required Siemens to provide for PJS benefits for legacy employees terminated after August 31, 1998, it is useful to make an overview of the

67

argument. When Siemens entered into the APA it knew of the sunset, successor employer, and termination of employment by Westinghouse[23] provisions of the Westinghouse Plan. Thus, if it had contractually obligated itself to extend PJS benefits to the legacy employees it would have been engaging in a rare, indeed inexplicable act of corporate benevolence as it would have been lifting three preexisting bars to the legacy employees advancing PJS claims after that date. It is, of course, perfectly obvious that Siemens had the exact opposite intent as it unmistakably revealed by contracting for the closing date for the purpose of pensions and benefits of the APA to be September 1, 1998. By the use of that date Siemens ensured that it would not become the employer for ERISA purposes until after the sunset provision had eliminated the legacy employees' potential claims for PJS benefits.[24]

Having completed our overview we now address Evans.

---

[23] By referencing Westinghouse we are including its subsidiaries and participating joint ventures in accordance with the Westinghouse Plan.

[24] Lest it be thought that we are ascribing to Siemens a motivation that it did not have in adopting the September 1, 1998 closing date we refer to an internal Siemens memorandum dated August 12, 1998, that indicated that among the advantages of having Siemens "lease" Westinghouse employees until August 31, 1998, Siemens "would not need to even include Section 19 (PJS) in new pension plan, as it would have expired before employees joined Siemens." J.A. 477.

In Evans, Cytec Industries, Inc., sold a portion of its business to Sterling Fibers, Inc., and pursuant to that sale, a number of Cytec employees continued employment with Sterling and became participants in Sterling's benefit plans.[25] Id. at 864-65. Section 5.05(f) of the asset purchase agreement required Sterling to provide postretirement medical and life insurance benefits to employees who continued employment with Sterling on a level at least equal to that of the Cytec Plan and required that Sterling obtain the written consent of Cytec prior to reducing benefits. Id. at 865. Sterling's Plan, however, did not include the relevant consent provision, and, in fact, provided that Sterling could amend the plan at any time by action of the plan committee. Id. Some years after the transaction, Sterling entered bankruptcy, and during the course of those proceedings, the bankruptcy court approved Sterling's "rejection" of the purchase agreement as an executory contract. Id. at 866. Soon thereafter, Sterling raised the transferred employees' benefit premiums beyond the premiums that the Cytec Plan had set without Cytec's written consent. Id. at 866-67. The employees sued Sterling, claiming that section 5.05(f) constituted a valid amendment to the Sterling Plan but not an executory contract, and thus it could not be rejected during the bankruptcy proceedings. Id. at 868.

Relying on its holding in a similar case, Halliburton Co.

---

[25]There were three related companies all including the name "Cytec" and it is unclear which one or whether they all made the sale to Sterling. The point, however, is not significant and as a matter of convenience we refer to one of the companies, Cytec Industries, as the vendor.

Benefits Committee v. Graves, 463 F.3d 360 (5th Cir. 2006), the court of appeals determined that section 5.05(f) of the asset purchase agreement constituted a valid amendment under ERISA of Sterling's benefit plan and that Sterling thus was required to abide by the terms of that provision. 660 F.3d at 874. In this regard, the court concluded that although the asset purchase agreement was extrinsic to the Sterling Plan and the provision itself was not included within the plan, the agreement constituted a valid plan amendment because the agreement was in writing, contained a provision directed to an ERISA plan, and the purchase agreement otherwise satisfied the formal procedure required for a plan amendment under the Sterling Plan. Id. at 871-72.

Appellees' reliance on Evans is misplaced. What appellees fail to recognize is that even if we were to conclude that the APA constituted a valid plan amendment of the Siemens Plans (a remarkable conclusion as they were not so incidentally non-extant as of the APA's execution) or that the APA otherwise defined Siemens' ERISA obligations, there is no provision within the APA requiring that Siemens provide PJS benefits to appellees, and, as we have indicated, it has not done so. Thus, Westinghouse and Siemens simply did not make an agreement providing for the extension of PJS benefits to the legacy employees.

In relevant part, paragraph 5.5(d)(iv) of the APA provides that Siemens "shall be solely responsible for . . . any benefits pursuant to Section 19 [the PJS provision] of the [Westinghouse] Pension Plan and the corresponding provision of the Siemens Pension Plan" with respect to legacy employees

70

after September 1, 1998, J.A. 139-40, but we already have concluded that appellees are not entitled to PJS benefits under section 19 of the Westinghouse Pension Plan. Although paragraph 5.5(d)(iv) may assume that Siemens would enact a corresponding PJS benefits provision, it does not require Siemens to do so and thus differs from the purchase agreement provisions at issue in Evans and Halliburton.[26] Cf. Evans, 660 F.3d at 865 ("[Sterling] shall continue to provide postretirement medical and life insurance benefits for such [qualifying] Acquired Employee[s] that are no less favorable to such Acquired Employee[s] than those benefits provided by [Cytec] under the [Cytec benefit plans] . . . and [Sterling] shall not

---

[26]Siemens argues that the APA contains language referencing a corresponding PJS benefit provision in the Siemens Plans because that language was drafted at a time when the parties believed that the transaction would close before the effective date of the sunset provision in the Westinghouse Plan. Under that belief that ultimately proved to be mistaken with respect to pensions and benefits, Siemens represents now that, to be in conformity with the Westinghouse Plan, it did intend to provide PJS benefits under its plans to the legacy employees from the date of closing through August 31, 1998, and the portion of paragraph 5.5(d)(iv) that implies that Siemens would provide PJS benefits is a vestige of that belief. Thus, Siemens views the language as contractually obsolete. While the long delay in completing the PGBU transaction suggests that Siemens' contention may be true, our conclusion regarding the import of the APA does not mean that we are accepting Siemens' representation for the reason of the mention of PJS benefits in the APA.

reduce the level of such benefits without the prior written consent of [Cytec] . . . ."); Halliburton, 463 F.3d at 365 ("[Halliburton] shall . . . take all corporation action necessary to: (i) maintain with respect to eligible participants . . . the [acquired company's] retiree medical plan, except to the extent that any modifications thereto are consistent with changes in the medical plans provided by [Halliburton] and its subsidiaries for similarly situated active employees . . . .").

Appellees' invocation of paragraph 5.5(d)(i) is likewise unavailing.  That provision required that Siemens "establish a defined benefit pension plan . . . that contains terms and conditions that are substantially identical with respect to all substantive provisions to those of the Westinghouse Pension Plan as in effect as of [September 1, 1998]." J.A. 138 (emphasis added).  We already have noted that paragraph 5.5(a)(ii), which requires Siemens to "provide compensation and benefit plans and arrangements which in the aggregate are comparable . . . to the compensation, Plans and Benefit Arrangements," of the Westinghouse Plan, id. 137 (emphasis added), supersedes paragraph 5.5(d)(i) to the extent they set forth disparate standards governing Siemens' pension obligations.  As we observed previously, the amendment to the APA that changed the closing date to September 1, 1998, for pension and benefit purposes did not specifically include section 5.5(a), and the closing date for purposes of section 5.5(a) thus technically remained August 19, 1998.  On that date, the Westinghouse Plan included the sunset provision, which provided that "[i]n no event shall a Permanent Job Separation occur after August 31, 1998." Id. 293.  Thus, even if we contorted section 5.5(a)'s "in the aggregate comparable" standard to require adherence to all

72

terms of the Westinghouse Plan, including the PJS benefits provision, section 5.5(a) would have required that Siemens offer PJS benefits to the legacy employees only through August 31, 1998. As the parties agree that Siemens did not terminate a legacy employee prior to September 1, 1998, Siemens' failure to offer PJS benefits from August 19, 1998 to August 31, 1998, did not deprive any legacy employee of benefits to which they were entitled.

If we focus on paragraph 5.5(d)(i), as appellees urge, the closing date of the APA for that paragraph was changed to September 1, 1998. As of September 1, 1998, the Westinghouse Plan still included the sunset provision. As complicated as this case might be, on this point the English language meaning of the Westinghouse Plan could not be clearer. Accordingly, even if we were to conclude that the APA constituted an amendment of the Siemens Plans or otherwise imposed upon Siemens pension obligations independent of any specific ERISA provision requiring that Siemens provide PJS benefits, paragraph 5.5(d)(i) of the APA did not require Siemens to provide PJS benefits to the legacy employees, because section 5.5(d) defines Siemens' pension obligations in relation to the Westinghouse Pension Plan as of September 1, 1998, and as of September 1, 1998, a permanent job separation could not occur under the Westinghouse Plan by virtue of the sunset provision.[27]

---

[27] On September 9, 1998, Westinghouse retroactively amended its plan to provide, among other things, a new date by which PJS benefits would be eliminated under the sunset provision. See J.A. 107 (Joint Statement of Undisputed Facts). The September 9 amendment, which was retroactively effective as of August

73

Appellees nonetheless urge that because we held in Bellas that the sunset provision was an illegal cutback under ERISA, Westinghouse's liability for PJS benefits extending past August 31, 1998 existed "as a matter of law" at the time of the APA's execution. Appellees' br. at 13. They contend that the sunset provision thus could not have limited Siemens' promise to provide substantially identical benefits. But as we have explained the legacy employees are not entitled to PJS benefits from Siemens without regard to the sunset provision and thus the invalidation of the sunset provision is of no help to them. In any event, we do not agree with appellees' expansive view of

31, 1998, provided that "[i]n no event shall a Permanent Job Separation occur after April 30, 2000." J.A. 466 (Amendment to the Westinghouse Plan). The parties agree that Siemens did not participate in Westinghouse's decision to enact this amendment, see J.A. 107, and appellees do not contend that Westinghouse's independent amendment of its plan bound Siemens. Nevertheless, we observe that although the September 9 amendment was retroactively effective to August 31, 1998, and paragraph 5.5(d)(i) provided that Siemens would offer a pension plan substantively identical to the Westinghouse Plan as of September 1, 1998, Westinghouse's unilateral retroactive amendment to its plan more than a week after September 1, 1998, did not alter Siemens' contractual undertaking in paragraph 5.5(d)(i) of the APA. By the plain terms of the Westinghouse Plan as they existed on September 1, 1998, the date Siemens was required to reference under paragraph 5.5(d)(i), PJS benefits were no longer available under the Westinghouse Plan by virtue of the original sunset provision, which eliminated those benefits following August 31, 1998.

74

the effect of <u>Bellas</u> on this point.

We recognize that nearly one year after the execution of the APA, the District Court for the Western District of Pennsylvania held that the sunset provision violated section 204(g), <u>see</u> <u>Bellas v. CBS, Inc.</u>, 73 F. Supp. 2d 500 (W.D. Pa. 1999), and one year later we affirmed that disposition, <u>see</u> <u>Bellas</u>, 221 F.3d at 517. We grant that at the time of the APA's execution, <u>Westinghouse</u> was nonetheless legally obligated under ERISA to allow for a permanent job separation to take place following August 31, 1998, notwithstanding the Westinghouse Plan's plain language to the contrary which neither we nor the district court yet had struck down. The <u>terms</u> of the Westinghouse Plan, however, did not obligate Westinghouse to provide PJS benefits after August 31, 1998, and it is the <u>terms</u> of the Westinghouse Plan measured as of September 1, 1998 — not Westinghouse's underlying ERISA obligations — that Siemens promised effectively to match in the APA. <u>See</u> J.A. 138 ("substantially identical with respect to all <u>substantive provisions to those of the Westinghouse Pension Plan</u> as in effect of [September 1, 1998]"). Considering that those terms had not yet been called into question by <u>Bellas</u>, we find that our holding in that case cannot alter the plain language of the APA.

Fundamentally, the APA is a contract. A basic principle of contract construction is that we must interpret and enforce unambiguous agreements according to their terms. <u>See</u> <u>McDowell v. Philadelphia Hous. Auth.</u>, 423 F.3d 233, 238 (3d Cir. 2005); <u>Morais v. Central Beverage Corp. Union Emps.' Supplemental Retirement Plan</u>, 167 F.3d 709, 712 (1st Cir.

75

1999) ("[C]ontracts containing unambiguous language must be construed according to their plain and natural meaning[.]") (quoting Smart v. Gillette Co. Long-Term Disability Plan, 70 F.3d 173, 178 (1st Cir. 1995)).[28] In no uncertain terms, Siemens agreed to provide benefits "substantially identical to" those provided under the Westinghouse Plan as of September 1, 1998, and the Westinghouse Plan did not provide PJS benefits for employees terminated after August 31, 1998, even putting aside the fact that it did not ever require Westinghouse to pay benefits to employees terminated by a successor employer. Our later invalidation of the sunset provision as to Westinghouse could not change the parameters of Siemens' contractual undertaking either with respect to the termination date of the separations for PJS eligibility or with respect to the entity terminating the employment, i.e., a Westinghouse employer. Nor, of course, could it change the Westinghouse Plan's provision that there would not be a permanent job separation of an employee offered continued employment by a successor employer.

In short, there are three separate reasons why appellees are not entitled to PJS benefits from Siemens: (1) the sunset

[28]Because the APA is a contract that "potentially affects rights protected by [ERISA] . . . [it] is likely subject to interpretation in accordance with tenets of federal common law." Smart, 70 F.3d at 178 (citing Pilot Life Ins. Co. v. Dedeaux, 481 U.S. 41, 56, 107 S.Ct. 1549, 1557 (1987)); cf. Morais, 167 F.3d at 711 ("[I]t is well settled that federal common law applies both to interpret the provisions of an ERISA benefit plan and to resolve '[i]ssues of relinquishment of rights and waiver' when such side agreements affect the benefits provided by an ERISA plan.").

76

provision cut-off date of August 31, 1998; (2) the provision that the terminating employer had to be a Westinghouse affiliate; and (3) the provision that there would not be a permanent job separation if a successor employer offered employment to a terminated employee.  If somehow in a way beyond our conception the APA could be deemed to have been modified by our invalidation of the sunset provision in Bellas, the remaining two bars nevertheless would remain in place to the end that appellees could not obtain PJS benefits from Siemens. Thus, as complicated as this case seems to be in the end the result that we must reach is quite clear.

## VI.  SUMMARY

In summary, we hold that appellees are not entitled to PJS benefits from Siemens.  First, we conclude that Siemens did not adopt the Westinghouse Pension Plan as an ERISA "transition" plan from August 19 to August 31, 1998, and thus did not violate section 204(g) when it adopted the Siemens Plans, which lacked PJS benefits.  Second, we conclude that because appellees had not satisfied the conditions for PJS benefits upon a hypothetical termination just prior to Westinghouse's transfer of liabilities to Siemens and could not satisfy in the future the conditions for those benefits, sections 204(g) and 208 did not protect those benefits from cutback and appellees' benefits would not have included PJS benefits upon Westinghouse Plan's hypothetical termination.  Consequently, Siemens' omission of PJS benefits from its Plans and appellees' resulting lack of entitlement to PJS benefits under Siemens

Plans upon a hypothetical termination basis just following the transfer of liabilities did not diminish appellees' benefits in violation of section 208. Finally, we conclude that Siemens did not obligate itself in the APA to provide PJS benefits to the legacy employees. Finding no ERISA provision that requires otherwise, we must enforce the Siemens Plans as written, and beyond any reasonable dispute those Plans do not entitle appellees to PJS benefits.

## VII. CONCLUSION

For the foregoing reasons, we will reverse the District Court's March 30, 2007 order to the extent that it denied Siemens' summary judgment and granted appellees summary judgment. Because we conclude that none of the appellees are entitled to PJS benefits from Siemens, we need not reach the questions certified for interlocutory appeal regarding the validity of the Release Plaintiffs' waivers as they did not have any PJS benefits to waive and we thus dismiss the certified interlocutory appeals. We likewise need not address appellees' related contention that the District Court erred in denying appellees' claim that they were entitled to retiree medical and life insurance benefits that they contended must accompany PJS benefits as there are no PJS benefits to accompany and we will dismiss the appeal relating to that issue. In sum, Siemens is entitled to summary judgment as to both the Release and the Non-Release Plaintiffs, i.e., all appellees, and we therefore will remand the case to the District Court to enter summary judgment for Siemens and for the Siemens Plans. The entry of that order will terminate this litigation on the substantive matters in issue.